# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JOANNE KIMBROUGH and WILLIE J. KIMBROUGH, SR.,**

                **Plaintiff,**

**-vs-**                                               **Case No. 6:05-cv-471-Orl-31KRS**

**CITY OF COCOA, DAVID CRAWFORD, WILLIAM GREGORY, WALTER BAKER, TERRENCE A. GLOVER, MICHAEL J. BADARACK, ANNA COX, RICHARD GREGG, II, OFFICER DOBSON, PHILIP B. WILLIAMS, BREVARD COUNTY, PRISON HEALTH SERVICES, INC., AILEEN NORGELL, BEVERLY WOOD, SANDY LATIER, PETER S. DOVGAN, HEALTH FIRST PHYSICIANS, INC., CATHERINE L. GARDNER, CENTRAL BREVARD RADIOLOGY, ABBAS RABIEI, BREVARD NEPHROLOGY GROUP, P.A., and CAPE CANAVERAL HOSPITAL, INC.,**

                **Defendants.**

---

# ORDER

     This case arises out the events surrounding the death of Willie J. Kimbrough, Jr.

("Kimbrough").  This matter comes before the Court on Motions to Dismiss filed by the

Defendants, and the Plaintiffs' Responses thereto.[1]

---

[1] The paired pleadings are as follows: the City of Cocoa's Motion to Dismiss, (Doc. 35), and the Plaintiffs' Response thereto, (Doc. 101); David Crawford's Motion to Dismiss, (Doc. 64), and the Plaintiffs' Response thereto, (Doc. 102); William Gregory's Motion to Dismiss, (Doc. 17), and the Plaintiffs' Response thereto, (Doc. 99); Walter Baker's Motion to Dismiss, (Doc. 19), and the

I.      **Background**

A. The Parties[2]

The Plaintiffs, Joanne Kimbrough and Willie J. Kimbrough, Sr., are Kimbrough's parents,

and are co-personal representatives of the estate of Kimbrough (the "Estate").  They bring this

action on behalf of the survivors of the Estate, including Ashanti Kimbrough, Victoria Fisher

Kimbrough, and Di'Andre Michael O'Shone White (the minor surviving children of Kimbrough).

The Plaintiffs were residents of Brevard County, Florida.

The City of Cocoa (the "City") is a municipal corporation organized and existing under the

laws of the State of Florida.  David Crawford ("Crawford") was the Chief of Police for the City.[3]

---

Plaintiffs' Response thereto, (Doc. 93); Terrence Glover's Motion to Dismiss, (Doc. 14), and the Plaintiffs' Response thereto, (Doc. 96); Michael Badarack's Motion to Dismiss, (Doc. 16), and the Plaintiffs' Response thereto, (Doc. 98); Anna Cox's Motion to Dismiss, (Doc. 15), and the Plaintiffs' Response thereto, (Doc. 95); Richard Gregg's Motion to Dismiss, (Doc. 12), and the Plaintiffs' Response thereto, (Doc. 97); Donald Dobson's Motion to Dismiss, (Doc. 9), and the Plaintiffs' Response thereto, (Doc. 100); Philip Williams' Motion to Dismiss, (Doc. 38), and the Plaintiffs' Response thereto, (Doc. 94); Prison Health Services' Motion to Dismiss, (Doc. 41), and the Plaintiffs' Response thereto, (Doc. 91); Aileen Norgell's Motion to Dismiss, (Doc. 42), and the Plaintiffs' Response thereto, (Doc. 90); Beverly Wood's Motion to Dismiss, (Doc. 43), and the Plaintiffs' Response thereto, (Doc. 92); Sandy Latier's Motion to Dismiss, (Doc. 44), and the Plaintiffs' Response thereto, (Doc. 89); Catherine Gardner's Motion to Dismiss, (Doc. 61), and the Plaintiffs' Response thereto, (Doc. 88);Central Brevard Radiology's Motion to Dismiss, (Doc. 61), and the Plaintiffs' Response thereto, (Doc. 88); Cape Canaveral Hospital, Inc.'s Motion to Dismiss, (Doc. 103), and the Plaintiffs' Response thereto, (Doc. 110).  Peter Dovgan, Health First Physicians, Abbas Rabiei and Brevard Nephrology did not file Motions to Dismiss.  Brevard County originally filed a Motion to Dismiss on March 28, 2005, (Doc. 5), but that Motion was denied without prejudice by an Order dated March 31, 2005, (Doc. 24), and although the Plaintiffs filed a Response thereto, (Doc. 87), it was unnecessary because Brevard County has not filed a renewed Motion to Dismiss.

[2] The allegations in this section are made "at all times relevant to this action."

[3] Unless otherwise noted, all individual defendants were residents of Brevard County, Florida. All references to "Brevard County" refer to Brevard County, Florida, unless otherwise noted.

William Gregory ("Gregory"), Walter Baker ("Baker"), Michael J. Badarack ("Badarack"), Richard Gregg, II ("Gregg"), and Anna Cox ("Cox") were police officers employed by the Cocoa Police Department ("CPD").[4]   Donald Dobson ("Dobson") was the CPD booking officer on duty at the time Kimbrough was booked.   Philip B. Williams ("Williams") was the Sheriff of Brevard County.   As Sheriff, Williams was the head official of the Brevard County Sheriff's Office ("BCSO"), which is responsible for operating the Brevard County Detention Center ("BCDC"). Brevard County (the "County") is a political subdivision of the State of Florida.

Prison Health Services, Inc. ("PHS") is a Delaware Corporation conducting business in Brevard County, Florida pursuant to a contract with the County, Williams and/or BCDC to provide medical care for the inmates at BCDC.   Aileen Norgell, M.D. ("Norgell"), Beverly Wood, P.A. ("Wood"), and Sandy Latier, R.N. ("Latier") were employees or agents of PHS.[5]

Peter S. Dovgan, M.D. ("Dovgan") is a doctor of vascular medicine licensed to practice medicine in Brevard County, and was doing business as Health First Physicians, Inc. ("Health First"), a Florida corporation.   Catherine L. Gardner, M.D. ("Gardner") is a doctor of radiological medicine licensed to practice medicine in Brevard County, doing business as Central Brevard Radiology, P.A. ("CBR"), a professional association organized under the laws of the State of Florida.   Abbas Rabiei, M.D. ("Rabiei") is a doctor of nephrological medicine licensed to practice medicine in Brevard County, and was doing business as Brevard Nephrology Group, P.A. ("BNG"), a professional association organized under the laws of the State of Florida.   Cape

---

[4]   Gregory, Baker, Glover, Badarack, Cox and Gregg are collectively referred to, where appropriate, as the "Arresting Officers."

[5]   Norgell is a medical doctor, Wood is a physician's assistant, and Latier is a registered nurse.

Canaveral Hospital, Inc. ("CCH"), doing business as Health First Cape Canaveral Hospital, is a Florida corporation conducting business in Brevard County.

B. Facts

*1) Arrest and beating*

On November 30, 2002, Kimbrough was walking in the vicinity of St. John's Street and Blake Avenue, near the Shadozz Lounge, in Cocoa, Florida.  Glover saw Kimbrough in the area of Peach Tree Street, and thought that Kimbrough was trying to break into a car.  After a foot chase, Glover caught Kimbrough, and then punched, kicked and struck him in the eye and other parts of his body before taking him to the ground.  Cox and Badarack then arrived on the scene, and proceeded to punch, kick and strike Kimbrough, and to use "knee spikes" against him.  Glover, Cox and Badarack continued to use this force against Kimbrough while he was face down on the ground.  Gregg, Gregory and Baker then arrived, and they also punched, kicked and struck Kimbrough.[6]  None of the Arresting Officers, in particular Cox, Gregory and Baker, the superior officers on the scene, stopped the other Arresting Officers from using force against Kimbrough.

While Kimbrough was face down on the ground, Baker asked the other Arresting Officers to "clear," and then maced Kimbrough in the face.  Both before and after the macing, Kimbrough asked the Arresting Officers to get off of him and informed them that he was suffering from an asthma attack.  Kimbrough was then placed in hand cuffs and leg shackles, after which the Arresting Officers continued to beat him as he lay cuffed and shackled on the ground.  One of the Arresting Officers then directed Kimbrough to get up.  Kimbrough was unable to comply with that

---

[6] As the Arresting Officers arrived on the scene, they circled their cars "wagon style" around Kimbrough.

command, so several of the Arresting Officers dragged him to one of the police cars and attempted to lean Kimbrough against the car, but Kimbrough fell to the ground.

As a result of the beating, Kimbrough suffered blunt traumas to his head, face, arms, chest, back and lower extremeties, particularly his left leg.  The Arresting Officers struck Kimbrough repeatedly in the upper thigh, which resulted in rhabdomyolysis, and in the testicles, causing severe damage.  The beating was so severe that Kimbrough defecated on himself during the incident.

### 2) Booking at CPD

Kimbrough was transported to CPD, where he was booked by officers of the CPD. Dobson, the booking officer on duty, witnessed Kimbrough being brought into the CPD. Emergency Medical Technicians ("EMTs") were called, and responded to the CPD in order to treat injuries Glover allegedly suffered, but no major injuries to Glover were found.  However, neither the Arresting Officers nor Dobson took any action to ensure that Kimbrough received medical care, nor did they ask the EMTs to evaluate Kimbrough.  While he was in a holding cell at CPD, Kimbrough begged for medical attention, but was refused help.

### 3) Kimbrough's transfer to, and stay at, BCDC

On December 1, 2002, Kimbrough was transported to, and admitted at, BCDC, where he was held to await formal charges.  While at BCDC, Kimbrough complained of difficulty breathing, painful swallowing, and extreme pain in his back, sides, face and thigh.  Kimbrough made a number of requests for medical attention.  Several inmates had to assist Kimbrough to the bathroom because he was unable to walk.  While using the bathroom, Kimbrough passed blood. Several inmates informed the medical staff that Kimbrough needed medical attention.

Kimbrough's family also requested that he receive medical care.  However, despite these requests for medical care, Kimbrough received "virtually no medical care" from PHS while at BCDC. Employees and agents of PHS, including Norgell, Wood and Latier failed to monitor and diagnose Kimbrough's medical condition and failed to transfer him to a hospital for emergency medical treatment.

### 4) Kimbrough's transfer to the hospital, and his subsequent death

On December 4, 2002, Kimbrough bonded out of BCDC, and family members brought him to CCH, where Kimbrough received care from Dovgan, Health First, Gardner, CBR, Rabiei, BNG and CCH.  Kimbrough presented to CCH with blood in his urine and severe diffuse body aches. He was diagnosed with acute renal failure secondary to rhabdomyolysis, and a history of hepatitis and electrolyte abnormalities secondary to rhabdomyolysis.[7]

Dovgan placed a right internal jugular catheter for hemodialysis access.[8]  After the catheter was inserted and fluids were administered, Kimbrough began to have difficulty breathing, became

---

[7] Rhabdomyolysis is the destruction or degeneration of skeletal muscle tissue (as from traumatic injury, excessive exertion, or stroke) that is accompanied by the release of muscle cell contents (as myoglobin and potassium) into the bloodstream resulting in hypovolemia (a decrease in the volume of the circulating blood), hyperkalemia (the presence of an abnormally high concentration of potassium in the blood), and sometimes acute renal failure.  Medline Plus, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last modified February 4, 2003).

[8] Hemodialysis is the process of removing blood from an artery (as of a kidney patient), purifying it by dialysis, adding vital substances, and returning it to a vein.  Medline Plus, *supra* at n.7.

hypotensive,[9] his systolic blood pressure dropped,[10] and he became unresponsive.  He was pronounced dead approximately twenty minutes later, at 5:07 p.m. on December 4, 2002.

    C. Plaintiffs' Claims

    In Count 1, the Plaintiffs assert a cause of action under 42 U.S.C. section 1983 ("Section 1983") against the City for deprivation of Kimbrough's Fourth, Fifth, Eighth and Fourteenth Amendment rights, alleging that the City had policies, customs or usages whereby officers: arrested individuals without probable cause, used excessive force in conducting arrests, failed to give proper medical treatment to suspects in custody, failed to stop other officers from using excessive force during arrests, placed persons in custody in holding cells when those persons were in need of medical care, and attempted to hide injuries caused by the excessive use of force during arrests.  The Plaintiffs also allege that the City had policies whereby the City failed to adequately supervise, train and discipline its police officers, and hired substandard officers.  The Plaintiffs assert that as a result of these constitutional deprivations, Kimbrough suffered injuries which caused his death.

    In Counts 2 through 8, the Plaintiffs assert causes of action under Section 1983 against the Arresting Officers and Dobson,[11] alleging that these defendants violated Kimbrough's Fourth, Fifth, Eighth and Fourteenth Amendment rights.  In Count 9, the Plaintiffs assert a cause of action

_____

    [9] Hypotension means abnormally low blood pressure.  Medline Plus, *supra* at n.7.

    [10] Systolic blood pressure is the highest arterial blood pressure of a cardiac cycle occurring immediately after the contraction of the left ventricle of the heart.  Medline Plus, *supra* at n.7.

    [11] Count 2 - Gregory; Count 3 - Baker; Count 4 - Glover; Count 5 - Badarack; Count 6 - Cox; Count 7 - Gregg; Count 8 - Dobson.

under Section 1983 against Crawford, in both his individual and official capacities, alleging that

Crawford, the Chief of the CPD, failed in his duty to train, supervise, discipline and control the

actions of the police officers under his control, which failures caused the deprivation of

Kimbrough's Fourth, Fifth, Eighth and Fourteenth Amendment rights.

In Counts 10 through 17,[12] the Plaintiffs assert causes of action for wrongful death under

Florida Statute sections 768.16 through 768.27 against the City, the Arresting Officers, and

Dobson, alleging that as a proximate result of the actions and/or negligence of these defendants,

Kimbrough suffered fatal injuries.

Counts 18 through 21 are brought against Brevard County and Williams in his official

capacity as Sheriff of Brevard County, asserting causes of action for wrongful death (Counts 18

and 19) and violations of Section 1983 (Counts 20 and 21).  The wrongful death counts assert that

Brevard County and Williams had a duty to provide medical care to Kimbrough while he was

detained at BCDC, and that the failure to provide such care resulted in Kimbrough's death.  The

Section 1983 counts similarly assert that Brevard County and Williams had a duty to provide

medical care to Kimbrough while he was detained at BCDC, and allege that these defendants had

policies, customs or usages whereby: corrections officers failed to notify medical staff and failed to

seek medical treatment for inmates; PHS and its employees provided inadequate medical care to

inmates; the transfer of injured inmates to the hospital was discouraged; BCDC was overcrowded

resulting in an inadequate number of medical staff to handle medical needs for the number of

inmates at BCDC; and employees were inadequately trained to handle inmates with medical

---

[12] Count 10 - City; Count 11- Gregory; Count 12 - Baker; Count 13 - Glover; Count 14 - Badarack; Count 15 - Cox; Count 16 - Gregg; Count 17 - Dobson.

problems.  The Plaintiffs further allege that these policies deprived Kimbrough of his Fourth, Fifth, Eighth and Fourteenth Amendment rights.

In Count 22, against PHS, the Plaintiffs assert that PHS was a state actor that acted through its employees and agents, including Wood, Latier and Norgell.  The Plaintiffs allege that PHS had a policy of hiring and retaining substandard medical care providers, inadequately training those providers, denying adequate medical treatment to inmates at BCDC, and failing to transfer to the hospital inmates who needed hospital care.  The Plaintiffs also allege that PHS, by and through its employees, ignored Kimbrough's requests for medical attention and failed to provide him with medical attention.  The Plaintiffs assert that PHS' actions caused deprivations of Kimbrough's Fourth, Fifth, Eighth and Fourteenth Amendment rights.  Count 33 asserts a negligence claim against PHS, alleging that Norgell, Wood and Latier were acting in the course and scope of their employment by, or as agents of, PHS, and that their failure to properly diagnose and treat Kimbrough resulted in his injuries and death.

Counts 23, 25, 27, 30, 31 and 32 assert claims for negligence against Dovgan, Gardner, Rabiei, Norgell, Wood, Latier, respectively, and allege that these individuals failed to properly diagnose, treat and care for Kimbrough, that these failures breached a duty of care owed to Kimbrough in such a way that their actions constituted negligence and fell below the prevailing standard of care.  Counts 24, 26 and 28 are brought against Health First, CBR, and BNG, respectively, for the acts of Dovgan, Gardner, Rabiei, and allege that these individuals were acting in the course and scope of their employment with Health First, CBR and BNG, respectively, and that the negligence of these individuals caused Kimbrough to suffer injuries and death.  Count 29, against CCH, asserts that: CCH selected and appointed various individuals to provide medical care

for Kimbrough; CCH, by and through its agents, including Dovgan, Gardner and Rabiei, evaluated, diagnosed and treated Kimbrough; CCH had a duty to properly diagnose, treat and care for Kimbrough; CCH breached that duty by failing to provide appropriate care and treatment to Kimbrough; and CCH's actions fell below the prevailing standard of care.

## II.  Standard of Review

In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff.  *Scheuer v. Rhodes*, 416 U.S. 232 (1974), and must limit its consideration to the pleadings and any exhibits attached thereto.  FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).  The Court will liberally construe the complaint's allegations in the Plaintiff's favor.  *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).  The Court will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief.  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."  *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), the rule to be applied is that, "courts must be mindful that the Federal Rules require only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (*citing* FED. R. CIV. P. 8(a)).  This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action.  *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001).  Instead, the complaint need only "contain

either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id.* (internal citation and quotation omitted).  "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *Sams v. United Food and Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989).

## III.   Legal Analysis

The Court notes at the outset that the prohibitions of the Fifth Amendment apply to the federal government, not to state actors.  *Rivera v. Allin*, 144 F.3d 719, 726 (11th Cir. 1998); *Riley v. Camp*, 130 F.3d 958, 972 n.19 (11th Cir. 1997) (Tjoflat, J., dissenting).  As there are no federal defendants in this case, the Plaintiffs' Fifth Amendment claims are without merit and will be dismissed.  Similarly, the Eighth Amendment does not apply in this case, because the protections afforded by that Amendment come into play "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977); *see also Hamm v. DeKalb County*, 774 F.2d 1567, 1572 (11th Cir. 1985).  Thus to the extent the Plaintiffs' Complaint asserts claims under the Eighth Amendment, those claims will be dismissed.[13]

A. City of Cocoa (Counts 1 and 10)

The City asserts that the Plaintiffs' claims against it should be dismissed for the following reasons: (1) the Fourteenth Amendment does not apply, as claims arising out of the arrest are

---

[13] The Plaintiffs have indicated that they do not have claims under the Fifth and Eighth Amendments.  (*See, e.g.*, Doc. 101 at 6).

properly analyzed under the Fourth Amendment; (2) punitive damages are not recoverable against a governmental entity; and (3) pursuant to Florida Statute section 768.28(9), the City cannot be vicariously liable for the allegedly malicious acts of its employees.

*1) Fourteenth Amendment (Count 1)*

The City correctly asserts that the Fourteenth Amendment does not apply to the Plaintiffs' claims related to Kimbrough's original seizure and arrest, which are instead governed by the Fourth Amendment.[14]  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  However, the Fourteenth Amendment does apply to the Plaintiffs' claims arising from conditions of Kimbrough's confinement.  *Hamm*, 774 F.2d at 1572.  State and local governments have an obligation to provide medical care to incarcerated individuals, *Ancata v. Prison Health Serv., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985), including those individuals who have been injured while being apprehended by the police.  *Aldridge v. Montgomery*, 753 F.2d 970, 972 (11th Cir. 1985).  Therefore, the Plaintiffs' Fourteenth Amendment claim against the City for the City's alleged failure to provide Kimbrough with medical care will not be dismissed.

*2) Punitive damages (Count 1)*

Municipalities are immune from punitive damages in actions brought under Section 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).[15]  Thus, to the extent the Plaintiffs' Complaint asserts a claim for punitive damages against the City, that claim is dismissed.

---

[14]  The City has not moved to dismiss the claims against it arising under the Fourth Amendment, and thus the Court will not address those claims.

[15]  The Plaintiffs have conceded as much.  (*See* Doc. 101 at 2).

*3) Wrongful death (Count 10)*

A government may be liable for the intentional acts of its employees committed during the course and scope of their employment. *Maybin v. Thompson*, 514 So. 2d 1129, 1131 (Fla. 2d DCA 1987). In Florida, that liability is limited by Florida Statute section 768.28(9), which provides, in relevant part, that the

> state or it subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

F.S. § 768.28(9)(a). Florida courts have construed the phrase "wanton and willful" as connoting "conduct much more reprehensible and unacceptable than mere intentional conduct." *Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987). Thus, in Florida, "a governmental entity is liable for all torts, negligent . . . and intentional . . . unless the actor was acting in bad faith or with a malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Id.*

In their Complaint, the Plaintiffs assert that the Arresting Officers and Dobson "acted in bad faith, with malicious purpose, with wanton and willful disregard of Kimbrough's human rights . . . ." (Doc. 2 at 11). This claim is specifically incorporated into the Plaintiffs' claim for wrongful death (Count 10) against the City. (Id. at 172). Therefore, having asserted that the City's employees acted with malicious purpose, the Plaintiffs' claim that the City is vicariously liable for the actions of those employees is barred by Florida Statute section 768.28(9). *Gomez v. Metro Dade County, Fla.*, 801 F. Supp. 674, 684 n.14 (S.D. Fla. 1992); *City of Coconut Creek v. Fowler*, 474 So. 2d 820, 822 (Fla. 4th DCA 1985). Accordingly, Count 10 will be dismissed.

-13-

B. Crawford (Count 9)

Crawford asserts that the Plaintiffs' claim against him should be dismissed because there is no allegation that he took direct action in relation to Kimbrough or that he breached any duty of care imposed by state or local law with respect to Kimbrough, and, further, a suit against Crawford in his official capacity is duplicative of the claim against the City.

*1) Official capacity*

Suits against government officials in their official capacity are functionally equivalent to direct suits against municipalities. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991); *see also Cooper v. Dillon*, 403 F.3d 1208, 1221 n.8 (11th Cir. 2005) (suit against defendant in his official capacity as Chief of Police of a municipality was the same as suit against the municipality). Where a government official is sued in his official capacity, the proper party in interest is the official's employer. *Abusaid v. Hillsborough County Bd. of County Comm'rs*, 405 F.3d 1298, 1302 n.3 (11th Cir. 2005). Because municipal governments may be sued directly, to keep both the municipality and the official (sued in his official capacity) in the lawsuit would be redundant. *Busby*, 931 F.2d at 776. Here, the Plaintiffs have sued both Crawford in his official capacity as Chief of Police of the Cocoa Police Department,[16] and the City of Cocoa. Accordingly, the Section 1983 claim in Count 9 against Crawford in his official capacity will be dismissed as duplicative of the claim against the City in Count 1.

---

[16] The Plaintiffs repeatedly refer to the City and the Cocoa Police Department as one entity ("City of Cocoa/Cocoa Police Department"), (Doc. 2 at 3), and refer to officers of the Cocoa Police Department as "officers of the City of Cocoa," (*Id*. at 34).

*2) Individual capacity*

Crawford does not address the Count 9 claims against him in his individual capacity other than to assert that "Plaintiffs have never served Crawford with a summons notifying him of claims against him in his individual capacity," and thus that "Crawford has no present obligation to respond to such claims." (Doc. 64 at 1 n.1). However, because Crawford has not filed a motion to dismiss on the grounds of improper or insufficient service, the Court finds that the claims in Count 9 against him in his individual capacity are viable.

C. The Arresting Officers (Counts 2 through 7)[17]

These defendants all make the same assertions regarding dismissal of the Plaintiffs' Section 1983 claims, arguing that they are each entitled to qualified immunity, and that the Fourteenth Amendment claims should instead be analyzed under the Fourth Amendment.

*1) Fourth and Fourteenth Amendments*

The Arresting Officers correctly assert that the Fourteenth Amendment does not apply to the Plaintiffs' claims related to Kimbrough's original seizure and arrest, which are instead governed by the Fourth Amendment.[18]  *Graham*, 490 U.S. at 395.  As discussed above, however, the Fourteenth Amendment does apply to the Plaintiffs' claims arising from the conditions of Kimbrough's confinement.

---

[17] None of these defendants addressed the wrongful death claims (Counts 11 through 16). Therefore those claims are not subject to dismissal.

[18] Regarding the Fourth Amendment seizure claims, the Plaintiffs allege only that Kimbrough's "right to be free from unreasonable seizures and excessive force against his person" was violated.  The Plaintiffs do not allege in either the general factual allegations or in the specific causes of action against each defendant, that the Arresting Officers arrested Kimbrough without probable cause.

*2) Qualified immunity*

The defense of qualified immunity is appropriate to consider at the motion to dismiss stage. *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1327 (11th Cir. 2003). The qualified immunity analysis has several steps. In order to receive qualified immunity, "the government official must first prove that he was acting within [the scope of] his discretionary authority." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003). Once the defendant establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate. *Id*. To determine whether qualified immunity is appropriate, the Court must ask two questions. First, whether, viewed in the "light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id*. (internal citation and quotation omitted). Second, if a violation of a right can be made out based on the facts alleged, the Court must determine whether that right was clearly established. *Id*. In making these determinations, the Court accepts "all well-pleaded facts in the complaint as true and draw[s] all inferences in the plaintiff's favor." *Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997); *see also O'Rourke v. Hayes*, 378 F.3d 1201, 1206 (11th Cir. 2004) (the Court "look[s] to the pleadings to see if the plaintiff has successfully alleged the violation of a clearly established right."). A motion to dismiss on qualified immunity grounds will be granted if the plaintiff's complaint fails to allege the violation of a clearly established constitutional right. *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001).

The parties have not disputed the fact that the Arresting Officers were acting within the scope of their discretionary authority during Kimbrough's arrest. Thus the Court turns to examine

whether the Complaint alleges: (1) the violation of a Constitutional right that was (2) clearly established.

### i. Constitutional violation

The Plaintiffs allege that the Arresting Officers violated Kimbrough's Constitutional rights in several ways: first, by using excessive force during his arrest in violation of the Fourth Amendment; second, by failing to prevent other officers from using excessive force, also in violation of the Fourth Amendment; and third, by refusing or ignoring Kimbrough's requests for medical care, in violation of the Fourteenth Amendment.  In their Motions to Dismiss, however, the Defendants only address the basic use of force claims, asserting that they did not act with sufficient force to cause a Constitutional violation, and thus the Court will limit its review to those claims.

The Fourth Amendment "encompasses the right to be free from the use of excessive force during an arrest." *Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004).[19]  The Eleventh Circuit has provided the following standard of review for excessive use of force cases:

> [T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation.

---

[19] "The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002).

*Id.*[20]  The Eleventh Circuit has recognized that "the typical arrest involves some force and injury." *Rodriguez v. Farrell,* 280 F.3d 1341, 1351 (11th Cir. 2002).

An officer's use of force must be judged on a case-by-case basis, and the determination of whether the force was reasonably proportionate to the need for that force involves a number of factors, including "the severity of the crime, whether the suspect pose[d] an immediate threat, and whether the suspect [was] resisting or fleeing." *Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997) (internal citation and quotation omitted); *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) (The "[u]se of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.") (internal citation and quotation omitted).  Using these factors, a court must balance the "necessity of the use of force used against the arrestee's constitutional rights . . . ." *Vinyard*, 311 F.3d at 1347; *see also Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (to determine if force was objectively reasonable, courts consider a variety of factors, including "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.") (internal citation and quotation omitted).  Qualified immunity applies in excessive force cases "unless application of the standard would inevitably lead every reasonable officer in [the position of the defendant officer] to conclude the force was unlawful." *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000) (internal citation and quotation omitted).

---

[20] Because the inquiry is one of objective reasonableness, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Jackson v. Sauls*, 206 F.3d 1156, 1170 (11th Cir. 2000).

The Plaintiffs' Complaint alleges that the Arresting Officers used excessive force against Kimbrough by repeatedly punching and kicking him, striking him with objects, beating him with their feet, knees and fists, and continuing this beating after Kimbrough was placed in hand cuffs and leg shackles.   Taking these facts as true, the actions of the Arresting Officers constitute excessive force, and therefore a violation of Kimbrough's Fourth Amendment rights.   *See Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (officers used excessive force where, after individual was handcuffed, officers kicked him, repeatedly hit his head on the sidewalk, and knocked him unconscious).[21]   Thus, the issue is whether the right that the Plaintiffs claim was violated was clearly established.

### ii. Clearly established right

The determination of whether a constitutional right was clearly established at the time of the incident must be made in the specific context of the case.   *Vinyard*, 311 F.3d at 1349.   "A right is clearly established if, in light of preexisting law, the unlawfulness of the official's conduct is

---

[21] The Plaintiffs also assert that while Kimbrough was being held face down on the ground by five officers, Baker asked the other officers to move and then maced Kimbrough in the face.  Baker asserts that the use of a chemical spray such as mace or pepper spray did not constitute excessive force.  It is true that the use of pepper spray is reasonable "where the plaintiff was either resisting arrest or refusing police requests . . . ."  *Vinyard*, 311 F.3d at 1348.   However, courts have "consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else."  *Id.*; *see also Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) (the use of pepper spray "may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force").  The facts as alleged indicate that Baker maced Kimbrough after Kimbrough had been caught, beaten, and was being held face down on the ground by five officers, and there is no indication that Kimbrough was resisting or refusing the Arresting Officers' requests.  Thus, at this stage, the Court finds that Baker's use of mace constituted excessive force.

'apparent'." *Cooper v. Dillon*, 403 F.3d 1208, 1220 (11th Cir. 2005); *Vinyard*, 311 F.3d at 1350

(issue is whether "it would be clear to a reasonable officer that his conduct was unlawful in the

situation he confronted."). This standard does not require that the particular conduct under

scrutiny was previously found to be unlawful. *Cooper*, 403 F.3d at 1220. Instead, the state of the

existing law must only be such that the official had a fair warning that his conduct is unlawful. *Id*;

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("If the law at that time was not clearly

established, an official could not reasonably be expected to anticipate subsequent legal

developments, nor could he fairly be said to 'know' that the law forbade conduct not previously

identified as unlawful.").

> The Eleventh Circuit has identified three categories of legal warning:

> First . . . whether the federal statute or constitutional provision is so clear, and the conduct is so bad, that it precludes qualified immunity even in the total absence of case law. Second, if the conduct is not bad enough that it violates a constitutional provision on its face, [a court] look[s] to case law that can be applied broadly to a number of factual situations. Third, and finally, if no broad case law is applicable, [the court] turn[s] to case law precedent that is tied to the facts.

*Kesinger v. Herrington*, 381 F.3d 1243, 1250 n.6 (11th Cir. 2004). In this case, a balancing of the

relevant factors reveals the following: Glover believed Kimbrough was attempting to break into a

car, and Glover had to chase Kimbrough; there is no indication that Kimbrough posed any threat,

either immediately after his seizure, after he was held down by multiple officers, or after he was

handcuffed and shackled; there is no indication that Kimbrough either resisted arrest or attempted

to flee after being seized; and Kimbrough suffered significant injuries which allegedly contributed

to his death. Case law is not necessary to determine that any reasonable officer should know that

such actions, if true, clearly violate the Fourth Amendment. *See Lee v. Ferraro*, 284 F.3d 1188,

1198-99 (11th Cir. 2002) ("[T]he grossly disproportionate force used . . . was clearly established as a constitutional violation because no reasonable officer could have believed that [the officer's] actions were legal."); *Smith v. Mattox*, 127 F.3d 1416, 1419-20 (11th Cir. 1997) (determining, after using multifactored balancing test, that case was one in which unlawfulness was apparent without clarifying case law).

### 3. Conclusion - Arresting Officers

The Arresting Officers are not entitled to dismissal on the grounds of qualified immunity on the Plaintiffs' Fourth Amendment excessive use of force claims.  Further, since the Arresting Officers have not contested the alleged violation of Kimbrough's Fourth and Fourteenth Amendment rights arising from the Arresting Officers' failure to prevent the other officers from beating Kimbrough and from their failure to ensure that Kimbrough received medical care while at the Cocoa Police Department, (Doc. 2 at 11), those claims will not be insulated by qualified immunity.

### D. Dobson (Count 8)[22]

Dobson asserts that there are no allegations that he acted with force toward Kimbrough and that he is entitled to qualified immunity.

Dobson asserts that the Plaintiffs' claim under the Fourth Amendment is deficient because there is no allegation that he acted with any force toward Kimbrough.  (Doc. 9 at 3).  Dobson is specifically named in only two paragraphs in the fact portion of the Complaint: paragraph 50 and 52.  Paragraph 50 alleges that

---

[22] Dobson does not address the claim for wrongful death in Count 17.  Therefore, that claim will not be dismissed.

> Kimbrough was transported to the Cocoa Police Department and booked by Cocoa
> Police Officers. The Booking Officer on duty, Officer Dobson, saw Kimbrough
> come into the Cocoa Police Department, but he did nothing to ensure that
> Kimbrough received medical treatment from the EMT's (sic) who were at the
> Cocoa Police Department that evening.

(Doc. 2 at 10-11).  Paragraph 52 alleges:

> Despite the obvious injuries to Kimbrough, and his soiled condition, Officer
> Badarack, Officer Glover, Sergeant Cox, Corporal Baker, Officer Dobson,
> Lieutenant Gregory, and Officer Gregg II, all failed to take any action to ensure that
> Kimbrough received medical care, and failed to stop other officers from using
> excessive force in arresting Kimbrough.  They did so despite the fact that
> Kimbrough was begging for help and had defecated on himself during his beating.
> None of the aforementioned Cocoa Police Officers ever asked the EMT's (sic) to
> evaluate Kimbrough.

(*Id*. at 11).  It is clear that Dobson only allegedly became involved in these events once Kimbrough

was brought to the Cocoa Police Department.  There are no allegations that Dobson participated in

Kimbrough's seizure or the subsequent violence, nor are there any allegations that Kimbrough was

subjected to acts of violence while at the Cocoa Police Department.  Thus, the allegation in

paragraph 52 that the officers all "failed to stop other officers from using excessive force in

arresting Kimbrough" does not apply to Dobson.  Because there are no allegations to connect

Dobson with Kimbrough's seizure and the subsequent violence, the Plaintiffs' Fourth Amendment

claim in Count 8 will be dismissed.[23]

Dobson has not challenged the merits of the Plaintiffs' Fourteenth Amendment claim in

Count 8.  Indeed, his Motion to Dismiss fails to address the Plaintiffs' allegations that he failed to

---

[23] The Plaintiffs appear to concede this issue, in that their Response only asserts that Dobson
violated Kimbrough's rights by failing to acknowledge Kimbrough's need for medical care, and by
failing to either provide such care or to require other officers to provide medical care.  (Doc. 100 at
3, 6).

provide Kimbrough with medical care.  Thus, the Plaintiffs' Fourteenth Amendment claim against

Dobson in Count 8 for the failure to provide Kimbrough with medical care will stand.

E. Williams (Count 21)[24]

The Plaintiffs make a conclusory allegation that Williams and/or his servants, agents or

employees violated Kimbrough's Fourth Amendment right to be "secure in [his] person[] against

unreasonable seizure including the use of excessive force."  (Doc. 2 at 63).  Nowhere, however, do

the Plaintiffs support this allegation with facts showing that either Williams or his agents or

employees participated in the arrest of, and violence against, Kimbrough.  Indeed all of the factual

allegations related to Williams focus on the alleged failure to provide Kimbrough with medical

care while he was held at BCDC.  (*Id*. at 60-62).  While these allegations may state a claim under

the Fourteenth Amendment, they do not state a claim under the Fourth Amendment.  Further, the

Plaintiffs may not recover punitive damages against Sheriff Williams in his official capacity,

because a suit against Williams in his official capacity is functionally equivalent to suing the

County.  *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1322 n.14 (11th Cir. 2000); *Colvin v.*

*McDougall*, 62 F.3d 1316, 1319 (11th Cir. 1995).[25]  Thus, the Fourth Amendment claim, as well as

the punitive damages claim against Williams in his official capacity, in Count 21 will be

dismissed.  As Williams has not addressed the Fourteenth Amendment claim, Count 21 remains

viable to that extent.

---

[24] Williams does not address the claim for wrongful death in Count 19.  Therefore, that claim
will not be dismissed.

[25] The Plaintiffs have conceded this point.  (Doc. 94 at 5).

F. PHS, Norgell, Wood and Latier (Counts 22 and 30 through 33)

*1) PHS - Section 1983 claims (Count 22)*

The Plaintiffs' Fourth Amendment claim against PHS must be dismissed, because there are

no allegations that PHS, or its agents or employees, were involved in the initial seizure of, or

violence against, Kimbrough.  However, Count 22 also asserts a claim under the Fourteenth

Amendment, which PHS did not address, so that claim remains viable.

*2) PHS, Norgell, Wood and Latier - Negligence claims (Counts 30 through 33)*

These defendants each make the same argument, asserting that Counts 30 through 33

should be dismissed because the Plaintiffs failed to comply with the pre-suit screening

requirements of Florida Statute sections 766.201-212.

Florida Statute section 766.203 provides, in relevant part, that

Prior to issuing notification of intent to initiate medical malpractice litigation
pursuant to s. 766.106, the claimant shall conduct an investigation to ascertain that
there are reasonable grounds to believe that:

(a) Any named defendant in the litigation was negligent in the care
or treatment of the claimant; and

(b) Such negligence resulted in injury to the claimant.

Corroboration of reasonable grounds to initiate medical negligence litigation shall
be provided by the claimant's submission of a verified written medical expert
opinion from a medical expert as defined in s. 766.202(5), at the time the notice of
intent to initiate litigation is mailed, which statement shall corroborate reasonable
grounds to support the claim of medical negligence.

F.S. § 766.203(2).[26]  Thus, the statute "requires a presuit investigation by the claimant to ascertain

that there are reasonable grounds to believe the claimant was injured by the negligence of a

medical provider."  *Wilkinson v. Golden*, 630 So. 2d 1238, 1239 (Fla. 2d DCA 1994); *see also*

*Maldonado v. EMSA Ltd. P'ship*, 645 So. 2d 86, 88 (Fla. 3rd DCA 1994).  The elements of

negligence and causation must be corroborated by the qualified expert.  *Apostolico v. Orlando*

*Reg'l Health Care Sys., Inc.*, 871 So. 2d 283, 286 (Fla. 5th DCA 2004).  Thus, together,

> the notice of intent to initiate and the corroborating medical expert opinion . . . must
> sufficiently indicate the manner in which the defendant doctor allegedly deviated
> from the standard of care, and must provide adequate information for the defendant
> to evaluate the merits of the claim.

*Maldonado*, 645 So. 2d at 89 (internal citation and quotation omitted).  The purpose of the expert

corroborative opinion is to "prevent the filing of baseless litigation."  *Shands Teaching Hosp. &*

*Clinics, Inc.*, 638 So. 2d 570, 572 (Fla. 1st DCA 1994); *see also Davis v. Orlando Reg'l Med. Ctr.*,

654 So. 2d 664, 665 (Fla. 5th DCA 1995) ("the corroborative medical opinion . . . assures the

Defendants, and the court, that a medical expert has determined that there is a justification for the

Plaintiffs' claim, i.e., that it is not a frivolous medical malpractice claim.") (*quoting Stebilla v.*

*Mussallem*, 595 So. 2d 136, 139 (Fla. 5th DCA 1992)).

The Plaintiffs have provided an affidavit from D. Preston Flanigan, M.D. ("Dr. Flanigan"),

(Doc. 91, Ex. A) (the "Corroborative Opinion"), as well as a notice of intent to initiate litigation,

(Doc. 91, Ex. B) (the "Notice of Intent").  The Notice of Intent states that an appropriate

---

[26] An "investigation" "means that an attorney has reviewed the case against each and every potential defendant and has consulted with a medical expert and has obtained a written opinion from said expert." F.S. § 766.202(4); *see also Maldonado v. EMSA Ltd. P'ship*, 645 So. 2d 86, 89 (Fla. 3rd DCA 1994).

evaluation by PHS and its employees, including Wood, "Norgey," and Latier, would have revealed that Kimbrough had a life threatening medical condition that required immediate medical treatment.  (*Id*. at 3).  The Notice of Intent also states (and the Plaintiffs assert in their Responses to the Motions filed by PHS, Norgell, Wood and Latier) that Dr. Flanigan opines that these four defendants deviated from the appropriate standard of care resulting in injury to Kimbrough, and that medical negligence occurred in the care and treatment provided to Kimbrough by these four defendants.  (*Id*. at 3-4; *see also* Doc. 91 (Response to PHS' Motion) at 8-10; Doc. 92 (Response to Wood's Motion) at 3-5; Doc. 90 (Response to Norgell's Motion) at 3-5; and Doc. 89 (Response to Latier's Motion) at 3-5).  These assertions, in both the Notice of Intent and in the Plaintiffs' Responses, are patently false.  The only time Dr. Flanigan mentions PHS is to state that he reviewed records from, *inter alia*, PHS.  (Doc. 91, Ex. A at 2).  PHS is never mentioned again, and Wood, Norgell and Latier are never mentioned at all, either explicitly or by reference, in the Corroborative Opinion.

Therefore, the Plaintiffs have failed to provide reasonable grounds to support their claim of medical negligence against PHS, Wood, Norgell, and Latier, and thus Counts 30 through 33 will be dismissed.

G. Gardner and CBR (Counts 25 and 26)

These defendants argue that the claims against them should be dismissed because: (1) the Complaint does not allege sufficient facts to support the elements of a negligence claim; (2) these counts incorporate assertions of the deprivation of constitutional rights which do not apply to these

defendants; and (3) the Plaintiffs have not complied with the pleading requirements of Florida

Statute section 768.21 for stating a claim for punitive damages in a civil case.[27]

The facts pled by the Plaintiffs, read in the light most favorable to the Plaintiffs, allege the

following story.  On December 4, 2002, Kimbrough was taken to CCH, where Gardner and CBR

undertook the duty to provide, and did provide, medical care to Kimbrough.  (Doc. 2 at 13, 73).  A

doctor placed a right internal jugular catheter for hemodialysis access, after which Kimbrough

began to have difficulty breathing, became hypotensive with decreasing systolic blood pressure,

became unresponsive, and was pronounced dead approximately twenty minutes later.  (*Id*. at 14).

The Plaintiffs then allege that the defendants failed to diagnose, care for and treat Kimbrough in

accordance with the accepted standards of care for physicians, it is more likely than not that but for

the "Defendant medical providers' negligence" Kimbrough would have survived, and because of

the defendants' failure to properly treat and care for Kimbrough, he suffered a decline in his

condition and death.  (*Id*.).

The Plaintiffs specifically assert that Gardner breached her duty of care to Kimbrough by

"inaccurately reporting the chest x-ray of December 4, 2002, by reporting that the internal jugular

line catheter was located in the superior vena cava or right atrium with no evidence of

pneumothorax," and that as a direct and proximate result of that negligence, the Plaintiffs are

entitled to certain damages.  (*Id*. at 73).  Further, the Plaintiffs allege that Gardner was acting

---

[27] The Plaintiffs state that they are not claiming that either Gardner or CBR violated Kimbrough's Constitutional rights. (Doc. 88 at 4). Further, the Plaintiffs have withdrawn their claim for punitive damages against both Gardner and CBR, but have reserved their right to reinstate a claim for punitive damages "if such a claim is warranted after an appropriate proffer by the Plaintiffs." (*Id*.). Accordingly, Counts 25 and 26 are dismissed to the extent that they assert claims for violations of Kimbrough's Constitutional rights and for punitive damages.

during the course and scope of her employment by, or as an agent of, CBR, and that it "is more likely than not had [Kimbrough's] condition been timely and properly diagnosed and appropriate treatment been rendered by [Gardner], [Kimbrough] would not have suffered injuries, including, but not limited to, further decline in his condition and his demise on December 4, 2002." (*Id*. at 75). Finally, the Plaintiffs allege that as a direct and proximate result of Gardner's negligence, they are entitled to recover certain damages from CBR. (*Id*.).

Gardner's and CBR's assertions that the Complaint does not sufficiently support the elements of breach and causation are without merit. The Plaintiffs specifically allege that Gardner breached her duty by her inaccurate reporting of Kimbrough's chest x-ray, and allege in several places, both generally as to the defendant medical care providers and specifically as to Gardner, that it is more likely than not that but for the defendants' negligence, Kimbrough would not have died. The Plaintiffs also specifically allege that Gardner was acting within the course and scope of her employment with, or as an agent of, CBR. Finally, the Plaintiffs allege that as a proximate result of Gardner's negligence, they are entitled to recover damages against both Gardner and CBR under Florida's wrongful death statute. Federal Rule of Civil Procedure 8(a), which does not require a plaintiff to specify their theory in precise detail, only requires that a defendant be put on notice as to the claims against him and the grounds upon which they rest, and does not require more. *Sams*, 866 F.2d at 1384. Accordingly, the Plaintiffs have stated a claim for which relief may be granted, and thus Gardner's and CBR's Motion to Dismiss will be denied (except as otherwise noted herein).

H. CCH (Count 29)

CCH asserts that Count 29 should be dismissed because: (1) it contains only bare

conclusions without sufficient supporting facts to determine what CCH did or how CCH caused

Kimbrough's injuries; (2) while the Plaintiffs appear to allege that CCH is liable for the acts of

certain individuals, there is insufficient information to determine who those individuals are, and

under what theory of liability (actual or apparent agency, respondeat superior, etc.) the Plaintiffs

seek to recover; and (3) there is no allegation to support the claim that CCH proximately caused

Kimbrough's death.

The Plaintiffs allege that Kimbrough was brought to CCH, where CCH undertook a duty to

provide, and did provide, medical care to him.  (Doc. 2 at 13).  The Plaintiffs further generally

allege that the defendants failed to diagnose, care for and treat Kimbrough in accordance with

accepted standards of care for physicians and hospitals.  (*Id*. at 14).  Then, specifically as to CCH,

the Plaintiffs allege that: (1) CCH selected and appointed employees, servants, agents, apparent

agents and employees to provide treatment for Kimbrough; (2) CCH, by and through its agents and

apparent agents, "including Dovgan, M.D., Gardner, M.D., and Rabiei, M.D.'s, servants and

employees evaluated, diagnosed and treated" Kimbrough; (3) CCH is directly and vicariously

liable for the negligent conduct of the nurses, physicians and staff, as well as agents, apparent

agents, servants and employees "hereinafter described;" (4) CCH, through its agents, servants and

employees, undertook a duty to properly diagnose, treat and care for Kimbrough; (5) CCH

breached its duty of care by "failing to provide appropriate care and treatment to [Kimbrough] by

giving fluid administration through the hemodialysis catheter, instead of peripherally, at a time

when [Kimbrough] was experiencing hemodynamic instability[;]" and (6) as a direct and

proximate result of CCH's negligence, the Plaintiffs are entitled to certain damages.  (*Id*. at 80-81).

Thus, the Plaintiffs have alleged sufficient facts to state a claim against CCH.  First, they have alleged the manner in which CCH was negligent: improper fluid administration.  Second, they have alleged the theories of liability: direct and vicarious liability.[28]  Third, although CCH is correct that the Plaintiffs fail to list those employees that paragraph 336 indicates will be "hereinafter described," the Plaintiffs have alleged at least some of the individuals for whose acts CCH is alleged to be liable, specifically Dovgan, Gardner and Rabiei, and CCH has not cited any authority for the proposition that the Plaintiffs must list in their Complaint every individual for whose conduct CCH may be vicariously liable.  Therefore, CCH's Motion to Dismiss will be denied.

## IV.    Conclusion

The defendants' Motions to Dismiss will be GRANTED only to the extent described herein.  Accordingly, it is

**ORDERED THAT**: (1) all claims under the Fifth and Eighth Amendments are DISMISSED; (2) the claim for punitive damages in Count 1 is DISMISSED; (3) the Fourth Amendment claim in Count 8 is dismissed; (4) all claims against Crawford in his official capacity in Count 9 are DISMISSED; (5) Count 10 is DISMISSED; (6) in Count 21, the Fourth Amendment claim, and the claim for punitive damages against Williams in his official capacity, are DISMISSED; (7) the Fourth Amendment claim in Count 22 is DISMISSED; and (8) Counts

---

[28] Rule 10(b) "does not require separate counts for distinct theories of liability, unless each count is founded upon a separate transaction or occurrence."  *Meade v. Prison Health Serv., Inc.*, 1194 WL 654509 at 4 (M.D. Fla. Nov. 10, 1994).  Upon repleading, however, the Plaintiffs should be prepared to more clearly enunciate their separate theories of direct and vicarious liability.

30, 31, 32 and 33 are DISMISSED.  The Plaintiffs shall have twenty days to replead in a manner consistent with this Order.[29]

> **DONE** and **ORDERED** in Chambers, Orlando, Florida on June 8, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

---

[29] The Plaintiffs should be prepared to clarify the allegations in their Complaint. The Complaint is replete with instances where the Plaintiffs failed to carefully delineate their claims against particular defendants, and instead engaged in indiscriminate copying-and-pasting of certain language. In addition to those instances already discussed, for example, the Plaintiffs repeatedly incorporate by reference in claims against the medical provider defendants (such as CCH or Dovgan) facts only relevant to the alleged Constitutional violations.  Further, in their pleadings, certain parties (Plaintiffs and Defendants alike) cite to the Florida Rules of Civil Procedure, which are clearly not applicable in this case, and rely solely on non-binding case law.  The parties are advised to be mindful of the forum in which they are litigating, and to govern their future pleadings accordingly.