**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JOANNE KIMBROUGH and WILLIE J.
KIMBROUGH, SR. et al.,

                        **Plaintiff,**

-vs-                                        **Case No.  6:05-cv-471-Orl-31KRS**

CITY OF COCOA, et al.
                        **Defendants.**

_____

## ORDER

      This case arises out of the events surrounding the death of Willie J. Kimbrough, Jr.

("Kimbrough"). This matter comes before the Court on Motions for Summary Judgment (Doc. 334

and 336) filed by the Defendants, Brevard Nephrology Group, P.A. ("BNG"), Abbas Rabiei, M.D.

("Rabiei") and Cape Canaveral Hospital, Inc. ("CCH"), and the Plaintiffs' Responses thereto (Doc.

388 and 387, respectively).

**I. Background**

      The Plaintiffs, Joanne Kimbrough and Willie J. Kimbrough, Sr., are Kimbrough's parents,

and are co-personal representatives of the estate of Kimbrough (the "Estate"). They bring this

action on behalf of the survivors of the Estate, including Ashanti Kimbrough, Victoria Fisher

Kimbrough, and Di'Andre Michael O'Shone White (the minor surviving children of Kimbrough).

(Doc. 121 at 5).[1]  Rabiei is a doctor of nephrological medicine licensed to practice medicine in

_____

      [1]Doc. 121 refers to  the Plaintiff's Third Amended Complaint.

Brevard County, and was doing business as an employee of BNG, a professional association organized under the laws of the State of Florida. (Rabiei Depo. at 9).

On November 30, 2002, Kimbrough  was chased, beaten and arrested by several City of Cocoa police officers in the vicinity of St. John's Street and Blake Avenue, near the Shadozz Lounge, in Cocoa, Florida. (Doc. 121 at 9-10).  As a result of the beating, Kimbrough suffered blunt traumas to his head, face, arms, chest, back and lower extremities, particularly his left leg. (Doc. 121 at 10). The beating was so severe that Kimbrough defecated on himself during the incident. (Doc. 121 at 10).

Kimbrough was transported to the City of Cocoa Police Department ("CPD"), where he remained until December 1, 2002, when he was transported to, and admitted at, the Brevard County Detention Center ("BCDC"). (Doc. 121 at 10-11).  While at BCDC, Kimbrough complained of difficulty breathing, painful swallowing, and extreme pain in his back, sides, face and thigh. (Doc. 121 at 12).  Several inmates had to assist Kimbrough to the bathroom because he was unable to walk. (Doc. 121 at 12).  While using the bathroom, Kimbrough passed blood. (Doc. 121 at 12).

On December 4, 2002, Kimbrough was bonded out and taken by family members to Cape Canaveral Hospital ("CCH"), where Rabiei and BNG, among others, undertook the duty to provide, and did provide, medical care to Kimbrough. (Doc. 121 at 13).  Kimbrough presented to CCH with blood in his urine and severe diffuse body aches. (Doc. 121 at 13).  He was diagnosed with acute renal failure secondary to rhabdomyolysis, and a history of hepatitis and electrolyte

abnormalities secondary to rhabdomyolysis.[2] (Doc. 121 at 13).  Rabiei ordered that Kimbrough be

put on dialysis.  Dr. Peter S. Dovgan ("Dovgan") placed a right internal jugular catheter for

hemodialysis access. (Doc. 121 at 13).  Dialysis was started at 15:40 hours on Dec. 4, 2002. (Doc.

388 at 3).  At 16:15 hours, Kimbrough complained that he was hot and a nurse took his blood

pressure, which was 143 over 34. (Doc. 388 at 3).  Normal saline was given to Kimbrough at that

time, through the hemodialysis catheter, but Kimbrough's blood pressure declined rapidly and a

code was called. (Doc. 388 at 3).

     The Plaintiffs allege that the Defendants failed to diagnose, care for and treat Kimbrough in

accordance with the accepted standards of care for physicians, it is more likely than not that but for

the "Defendant medical providers' negligence" Kimbrough would have survived, and because of

the defendants' failure to properly treat and care for Kimbrough, he suffered a decline in his

condition and death. (Doc. 121 at 14).  Specifically, Plaintiffs allege that Rabiei breached the

standard of care by ordering saline to be administered through the hemodialysis catheter, rather

than through a peripheral IV port.

## II. Standard of Review

     A party is entitled to summary judgment when the party can show that there is no genuine

issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d

---

[2]Rhabdomyolysis is the destruction or degeneration of skeletal muscle tissue (as from traumatic injury, excessive exertion, or stroke) that is accompanied by the release of muscle cell contents (as myoglobin and potassium) into the bloodstream resulting in hypovolemia (a decrease in the volume of the circulating blood), hyperkalemia (the presence of an abnormally high concentration of potassium in the blood), and sometimes acute renal failure. Medline Plus, U.S. National Library of Medicine, available at http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last modified February 4, 2003).

454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp*., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir. 1999).

-4-

### III. Legal Analysis

Plaintiffs' medical negligence claim is governed by Florida substantive law and Federal procedural law. *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)*.* "To prevail in a medical malpractice case a plaintiff must establish the following: the standard of care owed by the defendant, the defendant's breach of the standard of care, and that said breach proximately caused the damages claimed." *Rivet v. Perez*, 655 So. 2d 1169, 1171 (Fla. Dist. Ct. App. 1995) (internal citations omitted).  Here, Defendants contend that Plaintiffs have failed to offer sufficient evidence to establish a prima facie case of negligence.

*A. Establishing the Standard of Care*

"Section 766.102(1) [of the Florida Statutes] provides that a plaintiff in a medical malpractice claim has the burden of proving by the greater weight of the evidence that the actions of a defendant health care provider breached the prevailing professional standard of care for that provider." *Williamson v. Roth*, 120 F. Supp. 2d 1327, 1337 (M.D. Fla. 2000).  "Plaintiff must provide expert testimony to establish the prevailing professional standard of care." *Lambert v. United States*, 2005 U.S. Dist. LEXIS 21059, *9 (M.D.Fla. September 26, 2005).  Rabiei and BNG allege that Plaintiffs have failed to produce an expert witness competent to testify to the applicable standard of care. (Doc. 303 at 6).

With regard to the competency of witnesses, the Federal Rules of Evidence provide that:

Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law.

Fed. R. Evid. 601.  The Eleventh Circuit has interpreted this Rule to mean that, in cases involving state medical malpractice claims, Federal courts should apply state laws to determine competency of expert witnesses. *See McDowell v. Brown,* 392 F.3d 1283, 1295-6 (11th Cir. 2004) (adopting the reasoning in *Legg v. Chopra,* 286 F.3d 286 (6th Cir. 2002)).  Therefore, Florida law regarding the competency of expert witnesses in medical malpractice cases will be applied here.

Under Florida law, in order to qualify a witness as an expert in a medical negligence case, it must be shown that the witness either:

> 1. Is a similar health care provider pursuant to paragraph (a) or paragraph (b); or
> 2. Is not a similar health care provider pursuant to paragraph (a) or paragraph (b) but, to the satisfaction of the court, possesses sufficient training, experience, and knowledge as a result of practice or teaching in the specialty of the defendant or practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience, or knowledge must be as a result of the active involvement in the practice or teaching of medicine within the 5-year period before the incident giving rise to the claim.

Fla. Stat. § 766.102(2)(c) (2002).[3]

When the defendant is a certified specialist, a witness cannot be considered a "similar health care provider" unless he is certified in the same specialty as the defendant. Fla. Stat. § 766.102(2)(b) (2002).  However, "one need not be of the same specialty or branch of medicine [to] be qualified to give expert testimony on the standard of care." *Wright v. Schulte,* 441 So. 2d 660, 662 (Fla. 2d DCA 1983).  When the witness offered to establish the standard of care in a medical negligence case is not a similar health care provided, the Court is obligated to examine his

---

[3]This statute was amended in 2003 and 2004, however, the 2002 version was in effect when the cause of action accrued and therefore applies in this case.  Neither party disputes this.

background and credentials to determine whether the witness can qualify as an expert witness

under Fla. Stat. § 766.102(2)(c)(2). *Mitchell v. Angulo*, 416 So. 2d 910, 912 (Fla. 5th DCA 1982).

In *Green v. Goldberg,* an oncologist was allowed to testify as an expert witness in a

medical negligence case against a surgeon. 630 So.2d 606 (Fla. 4th DCA 1993).  In that case, the

plaintiff's wife died of breast cancer.  The oncologist was permitted to testify as to whether the

surgeon should have conducted a biopsy earlier.  Even though the oncologist did not actually

perform biopsies in his practice, he was qualified to testify because he frequently made

recommendations to surgeons regarding the need for biopsies in possible cancer cases.  The Court

noted that the central issue was the detection of cancer, not the conducting of surgery.

> [The witness] was qualified by training, education and experience in the diagnosis of breast cancer and possessed knowledge about the standards relating to when a biopsy should be performed, gained through experience, background and training.

*Green,* 630 So.2d at 609.

In *Wright v. Schulte,* a gynecologist, who did not perform surgery in his practice, was

permitted to testify against a surgeon.  The Court explained that "while the witness must have

sufficient familiarity with the particular medical technique involved in the suit, he need not have

personally performed the procedure or be a specialist in the area." 441 So. 2d at 662-663.

Regardless of whether the expert's knowledge comes from personal experience, observation, or

study, it is enough that the expert "exhibits such a degree of knowledge as to make it appear that

his opinion is of some value . . ." *Id.* at 662.

Under Florida law, "it is really a question of minimum standards as to whether a witness

can testify."*Mitchell,* 416 So.2d at 912.

-7-

> The clear purpose of the subsection is to restrict experts who claim to possess expertise on the gamut of medical problems and specialties and to eliminate those experts who are no longer actively involved in medicine.

*Green,* 630 So.2d at 608.

Rabiei and BNG argue that Plaintiffs' expert witness, Dr. D. Preston Flanigan ("Flanigan"), is not qualified to testify against Rabiei under § 766.102. (Doc. 334 at 8). Defendants point out that Flanigan is not a board-certified nephrologist.  Plaintiffs argue, however, that Flanigan is qualified because he "has worked with nephrologists on a daily basis in the management of dialysis access issues and . . . is well aware of the nephrologist's standard of care as regards knowledge and management of dialysis catheters." (Doc. 388 at 8).

There appears to be no dispute that Flanigan does not qualify as a "similar health care provider" under § 766.102(2)(b) because he is not certified in the same specialty as Rabiei. However, Flanigan still qualifies as an expert because he "possesses sufficient training, experience, and knowledge as a result of practice or teaching in the specialty of the defendant." Fla. Stat. § 766.102(2)(c)(2) (2002).

Flanigan testified at his deposition that, after inserting a dialysis catheter, he has been called by dialysis nurses or nephrologists when complications arise. (Doc. 292 at 308).[4]  It was his testimony that, when a dialysis patient has a problem within twenty-fours of having a catheter inserted, the cause of the problem may very well be a problem with the catheter.  (Doc. 292 at 118-119).  For that reason, he is knowledgeable in the treatment of dialysis patients after they leave his operating room and begin to receive dialysis. (Doc. 388-7).  Flanigan admits that he is not

―――――――――――――――――――――

[4]Dr. Flanigan's deposition is filed as Doc. 292.

qualified to testify about all aspects of nephrology, and that if Kimbrough had been a chronic

dialysis patient the situation would be different. (Doc. 388-7).  However, because this case

concerns the treatment of Kimbrough less than an hour after catheter insertion, Flanigan's

experience qualifies him to testify.

This case is about the treatment of a dialysis patient shortly after surgical placement of a

dialysis catheter, not nephrology in general.  Flanigan is a board certified vascular surgeon and has

extensive experience in evaluating the insertion of dialysis catheters. (Doc. 388-7)  Certainly

Flanigan has enough experience with post-op dialysis patients to offer a valuable opinion as to

whether Rabiei's actions met the standard of care.  The fact that he is not a nephrologist is merely

a fact for the jury to consider in deciding how much weight to give his testimony.

*B. Substance of Flanigan's opinions*

Rabiei and BNG also argue that Flanigan's opinions should not be admitted into evidence

because they are based on "insufficient data, speculation and assumptions" about the sequence of

events that occurred on December 4, 2002.  The Eleventh Circuit has held that once an expert

witness is found competent under state law, "his or her testimony should then be screened by Fed.

R. Evid. 702 to determine if it is otherwise admissible expert testimony." *McDowell*, 392 F.3d at

1295 (citations omitted). The Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

509 U.S. 579 (1993),  set out the applicable standard for the admissibility of expert testimony

under Federal Rule of Evidence 702 ("Rule 702").  Defendants have made no argument that

Flanigan's testimony fails the *Daubert* test, therefore, the Court need not address this issue at this

time.

Furthermore, it is precisely the type of factual "assumptions" noted by Rabiei and BNG that demonstrate that there are still material questions of fact to be resolved in this case. It is true that Flanigan has qualified his criticisms of Rabiei. He has stated that Rabiei was negligent only *if* he ordered fluids to be administered through Kimbrough's hemodialysis catheter. (Doc. 292 at 109). Rabiei himself admitted that it was possible that he gave such an order to the nurses. (Rabiei Depo. at 38-40). The fact that Flanigan does not know whether Rabiei gave that order or whether the nurses took that action on their own accord, does not render his testimony inadmissible. It will be up to a jury to decide, after considering all the evidence, whether the Plaintiffs have shown that either sequence of events is more likely than not true. Flanigan has offered an opinion for either contingency: If Rabiei gave the order he was negligent according to Flanigan, if the nurses acted without an order, they were negligent according to Flanigan. (Doc. 292 at 101, 109). It will be up to a jury to make the determination as to which witnesses to believe and whether there was in fact any breach of duty.

*C) Causation with regard to Rabiei and BNG*

Finally, it is argued that Plaintiffs have failed to offer testimony that Rabiei's actions were the cause of Kimbrough's death. This is patently untrue. Plaintiffs are not required to establish that Rabiei's actions were the *sole* cause of Kimbrough's death, only that it is more likely than not that they were a *substantial* cause of his death. *See Gooding v. University Hospital Building, Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984). Flanigan testified at his deposition that, in light of the perforation (most likely caused by the catheter insertion), fluid administration through the catheter could have caused or aggravated the pericardial tamponade, which ultimately was determined to be the cause of Kimbrough's death by the medical Examiner, Dr. Paul Vasallo. (Doc. 292 at 286-287;

Vasallo Depo. Def. Ex. 1 at 3).  Again, whether the Plaintiffs have actually shown by a preponderance of the evidence that Rabiei's actions were a proximate cause of Kimbrough's death will be an issue for a jury to decide.

   *D) Breach with regard to CCH*

   CCH has moved for summary judgment on the charge of direct negligence, which relates only to the actions of the nurses in CCH's dialysis unit.  CCH contends that Plaintiffs have failed to offer sufficient evidence  to establish a breach of the standard of care by the nurses.

   CCH contends that the nurses in the dialysis unit were simply following orders when administering fluids to Kimbrough, and therefore did not breach the standard of care.  It is true that Plaintiff's criticisms of the nurses apply only if they were not following orders given to them by a doctor.  However, as discussed above, whether or not they were given that order is a question of fact for the jury.

   Defendant further asserts that, even if Rabiei did not give an order, the nurses were following procedures described in the Routine Hemodialysis Orders ("RHO"), and therefore they were not negligent.  However, there is still a factual dispute as to the meaning of the instructions in the RHO, whether normal saline is a "medicine" under the RHO, and whether the nurses actually were following orders, particularly in light of CCH's written policy entitled "Use and Care of Dialysis Access Catheter."

**IV. Conclusion**

For the reasons stated above, summary judgment is inappropriate in this case.

Accordingly, it is

**ORDERED** that Defendants' Motions for Summary Judgment (Doc. 334 and 336) are

**DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 25, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party