**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JOANNE KIMBROUGH and WILLIE J. KIMBROUGH, SR. et al.,**

        **Plaintiff,**

-vs-                              **Case No. 6:05-cv-471-Orl-31KRS**

**CITY OF COCOA, et al.,**

        **Defendants.**

## ORDER

This case arises out of the events surrounding the death of Willie J. Kimbrough, Jr. ("Kimbrough"). This matter comes before the Court on Motions for Summary Judgment filed by the Defendants, Prison Health Services, Inc. ("PHS") (Doc. 349), Aileen Norgell, M.D. ("Norgell") (Doc. 351), Physician Assistant Beverly Wood ("Wood") (Doc. 352) and Registered Nurse Sandy Latier ("Latier") (Doc. 353), and Plaintiffs' Responses thereto (Doc. 384, 385, 386 and 391, respectively).

**I. Background**

    *A) Parties*

The Plaintiffs, Joanne Kimbrough and Willie J. Kimbrough, Sr., are Kimbrough's parents, and are co-personal representatives of the estate of Kimbrough (the "Estate"). They bring this action on behalf of the survivors of the Estate, including Ashanti Kimbrough, Victoria Fisher

Kimbrough, and Di'Andre Michael O'Shone White (the minor surviving children of Kimbrough). (Doc. 121 at 5).[1]

PHS is a private company which was under contract with Brevard County (the "County") in December, 2002 to provide medical services to inmates incarcerated at the Brevard County Detention Center ("BCDC"). Norgell was the Medical Director at BCDC, employed by PHS, in December 2002. Wood and Latier were employees of PHS who worked at BCDC in December, 2002.

*B) Treatment of Kimbrough*

On the night of November 30, 2002, Kimbrough was chased, beaten and arrested by several police officers in the City of Cocoa. In the early morning hours of December 1, 2002 Kimbrough was transported to the BCDC. (Wood Depo. at 214-15). When he arrived at BCDC his eye was badly bruised and swollen and he had trouble standing while being fingerprinted. (Mendiola Depo. at 11-12, 17; Peggy Williams Depo. at 9-10). Rather than sending Kimbrough to the hospital, BCDC took custody of him.

At 4:00 p.m. on December 1st, Kimbrough was seen in the infirmary by Latier, who noted that he was in a wheelchair because he was unable to walk, he had a black eye, and his left thigh was swollen. (Latier Depo. at 42-44). Norgell approved a telephone order for two Extra Strength Tylenol twice daily and Kimbrough was placed in the medical pod of the jail. (Latier Depo. at 46-48).

---

[1]Doc. 121 refers to Plaintiff's Third Amended Complaint.

On December 2, 2002 Kimbrough visited the infirmary twice and was seen by Norgell both times. Kimbrough told Norgell that he had been beaten by police officers and that he thought his left leg and ribs were broken. (Norgell Depo. at 71). Kimbrough was still in a wheelchair and told Norgell that he could not walk because his leg hurt. (Norgell depo. at 71). He also complained that he had been vomiting blood and had blood in his stool. (Norgell Depo. at 71). Norgell did a brief physical examination and prescribed 650mg of Tylenol twice daily, and 150mg of Zantac twice daily. (Norgell Depo. at 17, 79-81). During Kimbrough's second visit to the infirmary, Norgell ordered an X-ray of his leg and chest but these x-rays were never performed. (Norgell Depo. at 98; Wood Depo. at 133). Norgell admits that she only examined Kimbrough's thighs while he was seated in the wheelchair and did not examine the back of either thigh. (Norgell Depo. at 120-1). She offered him a bed in the infirmary but he refused because he wanted access to the telephone. (Norgell depo. at 106).

At some point on December 3, 2002 Norgell was notified that Kimbrough had been having trouble urinating and had blood in his urine. (Norgell Depo. at 129-30). She ordered a urinalysis and Wood offered to perform the test. (Norgell Depo. at 129-30). Kimbrough was brought to the infirmary at 3:30p.m. on December 3rd, and Wood attempted to get a witnessed urine sample from him, but Kimbrough was unable to urinate. (Wood Depo. at 71-4). At this time Kimbrough complained of sweats and coughing up blood. (Wood Depo. at 75-6). Wood was concerned that he had a respiratory infection, possibly even tuberculosis. (Wood Depo. at 75-6). Wood listened to his breathing with a stethoscope and prescribed two kinds of antibiotics. (Wood Depo. 76, 189). Wood also noticed at this time that Kimbrough was having trouble standing up on his own. (Wood Depo. at 91). Wood tried to obtain a urine sample again at 5:15p.m. with no success. (Wood

Depo. at 94-5). At that point she offered to catheterize Kimbrough but he refused. Wood was not able to obtain a sample from Kimbrough until 8:20p.m. (Wood Depo. at 95-6). Wood testified that Kimbrough's urine was "amber" when it should have been "straw colored." (Wood Depo. at 107). She believed there was blood in his urine but did not use a microscope to find out if it was blood or myoglobin producing the red color. (Wood Depo. at 151-2). Wood admits that at this point she suspected that Kimbrough had one of three serious medical conditions: dehydration, injury to his kidneys, or problems with the flow of blood to the kidneys. (Wood Depo. at 99-102). She ordered blood work to be done the next morning. (Wood Depo. at 138).

Late in the evening of December 3rd Kimbrough made bond and was picked up by his family. His family took him to Cape Canaveral Hospital at 1:22am on December 4th, where he was diagnosed with acute renal failure secondary to rhabdomyolysis.[2] (Doc. 384-4; Doc. 384-5). Kimbrough died later that day as a result of complications from dialysis.

## II. Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the

---

[2]Rhabdomyolysis is the destruction or degeneration of skeletal muscle tissue (as from traumatic injury, excessive exertion, or stroke) that is accompanied by the release of muscle cell contents (as myoglobin and potassium) into the bloodstream resulting in hypovolemia (a decrease in the volume of the circulating blood), hyperkalemia (the presence of an abnormally high concentration of potassium in the blood), and sometimes acute renal failure. Medline Plus, U.S. National Library of Medicine, available at http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last modified February 4, 2003).

burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir. 1999).

**III. Legal Analysis**

   *A) 42 U.S.C. § 1983 Claims Against PHS*

A claim for relief under 42 U. S. C. § 1983 ("§ 1983") requires that Plaintiff allege a "deprivation of an actual constitutional right." *McElligott v. Foley,* 182 F.3d 1248, 1254 (11th Cir. 1999). "It is well settled that the deliberate indifference to serious medical needs of prisoners" constitutes a violation of the 8th Amendment to the United States Constitution.[3] *Id.* (internal citations omitted). Therefore, to establish a claim under § 1983, a Plaintiff must allege (1) a serious medical need, (2) deliberate indifference to that need by Defendant, and (3) a causal connection between Defendant's deliberate indifference and Plaintiff's injuries. *See Hatten v. Prison Health Services, Inc.,* 2006 U.S. Dist. LEXIS 65143, *11 (M.D.Fla. Sept. 13, 2006).

   *1. Deliberate Indifference*

PHS contends that Plaintiffs have failed to allege facts that would establish deliberate indifference to Kimbrough's serious medical needs. "[D]eliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott* at 1255. Examples of deliberate indifference include, *inter alia,* (1) when an official knows that an inmate is in serious need of medical care and fails or refuses to obtain medical treatment for the inmate, (2) when a decision is made to take an easier, less efficacious course of treatment, (3) when the need for medical care is obvious and the care that is given is so cursory as to amount to no care at all, or (4) when there is

---

   [3]Because Kimbrough was a pretrial detainee, his rights arise under the 14th Amendment, however, "the case law developed with regard to the Eighth Amendment prohibitions against cruel and unusual punishment is analogous." *Hatten v. Prison Health Services, Inc.,* 2006 U.S. Dist. LEXIS 65143, *11 (M.D.Fla. Sept. 13, 2006) (internal citations omitted).

an unjustified delay in providing medical care for a known serious condition. *See id.* "The medical needs of inmates need not be considered 'life threatening' to be considered serious." *Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir. 1989) (internal citations omitted).

In this case, PHS staff was well aware of Kimbrough's injuries. Kimbrough was complaining of pain in his leg and difficulty walking from the moment he was admitted to BCDC. He was presented to the medical staff several times with a badly bruised and swollen eye, and indicated that he thought his leg and ribs were broken. In response to Kimbrough's complaints, Norgell ordered x-rays because she thought Kimbrough might have an infection or there may be a foreign body in his leg, however, she did not specify when the x-rays were to be taken and they never were. (See Norgell Depo. at 91, 117-20). PHS staff members were also aware that Kimbrough was having difficulty passing urine and had blood in his urine. PHS employee Wood admitted in her testimony that such symptoms can indicate at least three different serious medical conditions. Even to a lay person, it is obvious that blood in the urine is an indication of a serious medical need. It can hardly be disputed that Plaintiffs have presented sufficient evidence of subjective knowledge of Kimbrough's serious medical need.

Plaintiffs next allege that Defendants disregarded Kimbrough's serious medical condition because they failed to provide adequate treatment or to send him to a hospital. Defendants, however, contend that Kimbrough was seen several times by medical staff and provided treatment each time.

A reasonable jury could find that the medical treatment provided was so cursory as to amount to no treatment at all. The facts as alleged by the Plaintiffs show that the staff made several attempts to diagnose Kimbrough, but never followed through on those efforts. Latier and

Norgell examined Kimbrough's leg, but only the front of his thigh, while he was seated. Norgell ordered an x-ray, but the x-ray was never taken. Norgell ordered a urinalysis and Wood obtained a urine sample, but never looked at it under a microscope and never reported the findings to Norgell. Wood stated that she suspected Kimbrough was suffering from compartment syndrome, which she admits is a serious medical condition for which an inmate should be sent to a hospital, but she never sent Kimbrough to the hospital or even communicated these suspicions to Norgell. (Wood Depo at 153). It can hardly be said that anything done by the PHS staff can be considered "treatment" if, as Plaintiffs' expert witness Dr. Joe Godenson ("Godenson") opines, it can barely be considered adequate evaluation. (Godenson May Depo. at 125-26).[4] The only "treatment" PHS employees offered was to prescribe Tylenol to a man complaining of broken ribs and a broken leg and Zantac for complaints of vomiting blood and bloody stool. Tylenol (acetaminophen) is an over-the-counter medication for relief of *minor* pain, with a recommended dose of 650mg every 4 to 6 hours.[5] Kimbrough was prescribed 650mg every *twelve* hours, which would offer little if any comfort to a patient with his symptoms. Zantac (ranitidine) is an over-the-counter medication used to treat ulcers, indigestion, heartburn, etc., it is not indicated for serious gastrointestinal problems

---

[4] Godenson was deposed on May 11, 2006 and then again on August 4, 2006. The two depositions will be referred to hereinafter as "Godenson May Depo." and "Godenson Aug. Depo." respectively.

[5] *See* Medline Plus, U.S. National Library of Medicine, available at www.nlm.nih.gov/medlineplus/druginfo/uspdi/202001.html.

(i.e vomiting blood or bloody stool).[6] The use of these drugs to treat Kimbrough's symptoms is so cursory as to amount to no treatment at all.

Finally, PHS asserts that none of the actions complained of by Plaintiffs amount to more than mere negligence. However, Godenson testified that, in his opinion, these actions (or inactions) by PHS staff with regard to the treatment of Kimbrough constitute deliberate indifference. (Godenson May Depo. at 135-36). The final determination will be left to a jury.

### 2. Custom or Policy

PHS correctly asserts that the doctrine of respondeat superior does not apply to claims arising under § 1983. *Engelleiter v. Brevard County Sheriff's Dept.*, 290 F. Supp. 2d 1300, 1308 (M.D.Fla. 2003). PHS then argues that to establish a claim against it, Plaintiff must show that the violation of Kimbrough's constitutional rights was the result of a "policy" or "custom" maintained by PHS. PHS contends that Plaintiffs have failed to produce evidence of a custom or policy of PHS that caused Kimbrough's injuries.

PHS, however, has ignored a large body of case law in its argument. While it is true that § 1983 liability cannot be imposed under a theory of respondeat superior, PHS may still be liable under § 1983 for the single act of a final policymaker. *See Mandel* at 791-2. In fact, PHS' liability under § 1983 may be established in one of four ways:

> (1) the constitutional deprivation was caused by a policy or custom of the local governmental entity, *or* (2), the final policymakers of the local governmental entity acted with deliberate indifference to a constitutional deprivation, *or* (3) the final policymakers of the local governmental entity delegated their authority to a subordinate who, in turn, caused a constitutional deprivation, *or* (4) the final policymakers of the local governmental entity

---

[6]*See* Medline Plus, U.S. National Library of Medicine, available at www.nlm.nih.gov/medlineplus/druginfo/uspdi/202283.html.

>ratified a constitutionally impermissible decision or recommendation of a subordinate employee.

*Sherrod v. Palm Beach County School District,* 424 F. Supp. 2d 1341, 1344 (S.D.Fla. 2006) (emphasis added). The question of whether an individual has final policymaking authority is one to be determined by looking at state and local law as well as the custom or usage of the local government entity. *See Mandel* at 792.

In *Mandel*, the Eleventh Circuit found that a physician's assistant, Hatfield, was a "final policymaker" with regard to medical decisions at a prison, and therefore the County that operated the prison could be held liable for his actions under § 1983. *Id* at 794. The court found that, even though Hatfield was supposed to be supervised by a medical doctor, in fact he was not and his "medical decisions were subject to no supervision or review." *Id.* at 794. The Court noted that

>[A] municipality may be liable under § 1983 where a deliberate choice is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Id.* at 795. (internal citation and quotations omitted). The County in *Mandel* was held liable for the deliberately indifferent decisions Hatfield made with regard to the treatment and care of a particular inmate. *Id.* at 784.

In this case, Norgell's actions as the Medical Director for BCDC, are enough to establish PHS' liability under § 1983. It is clear from the testimony of the parties that Norgell had final policymaking authority with regard to medical decisions at BCDC and was not subject to any sort of meaningful administrative review. Norgell testified that she did not have to get approval to send patients to the emergency room or get STAT blood work, but would only request approval for something "unusual." (Norgell Depo. at 26-30). There is no apparent oversight for her decisions

*not* to send patients out for additional procedures. There are several examples in this situation of Norgell acting on her own initiative, as well as approving the actions of Latier and Wood. Norgell was involved in Kimbrough's case from beginning to end, first by ordering Latier to prescribe Tylenol, and finally by ordering Wood to conduct a urinalysis on December 3rd. Norgell also had direct contact with Kimbrough at least twice during his stay at BCDC. PHS is liable for all deliberately indifferent acts and decisions made by its final policymakers which result in violations of the constitutional rights of inmates. Therefore, it is unnecessary for Plaintiffs to demonstrate a "custom or policy" in this case.

### 3. Causation

PHS also argues that Plaintiffs have failed to show a causal link between any deliberate indifference by PHS and Kimbrough's death. Plaintiffs allege that if PHS had sent Kimbrough to the hospital he could have been treated with IV fluids and antibiotics and may not have required the emergency dialysis which ultimately led to his death. (Godenson May Depo. at 116-18). Whether any actions by PHS were substantial factors leading to the death of Kimbrough will be a question for the jury.

### 4. Punitive Damages

"[P]unitive damages are available in a 'proper' § 1983 action ." *Carlson v. Green*, 446 U.S. 14, 22 (1980). "[A] municipality (as opposed to an individual defendant) is immune from liability for punitive damages under § 1983. A significant part of our reasoning was that deterrence of constitutional violations would be adequately accomplished by allowing punitive damages awards directly against the responsible individuals." *Smith v. Wade*, 461 U.S. 30, 36 (U.S. 1983). PHS claims that it should be immune from punitive damages as well because it "stands in the shoes" of

the county when it provides medical care to inmates at BCDC. Plaintiffs allege that PHS is not an agent of the County and therefore can be held liable for punitive damages. However, neither party has presented any legal argument to support their claims.[7] As the issue of punitive damages does not need to be decided at this stage of the proceedings, the Court reserves judgment on that issue at this time.

*B)Medical Negligence Claims*

Plaintiffs' medical negligence claims are governed by Florida substantive law and Federal procedural law. *See Erie R.Co. v. Tompkins*, 304 U.S. 64 (1938). "To prevail in a medical malpractice case a plaintiff must establish the following: the standard of care owed by the defendant, the defendant's breach of the standard of care, and that said breach proximately caused the damages claimed." *Rivet v. Perez*, 655 So. 2d 1169, 1171 (Fla. 3d DCA 1995) (internal citations omitted). Here, Defendants contend that Plaintiffs have failed to offer sufficient evidence to establish a prima facie case of negligence, primarily because the testimony of their expert witness, Dr. Godenson,[8] made only "conclusory" allegations of negligence. This is patently untrue. In his depositions, Dr. Godenson offered specific criticisms of Latier, Wood and Norgell.

Godenson criticized Nurse Latier for failing to do a complete examination, take a complete history, or provide Norgell with the appropriate information. (Godenson May Depo. at 59-66).

---

[7]Plaintiffs refer to Florida statutory law in their discussion of punitive damages. (Doc. 384 at 24). "Section 768.72 [of the Florida Statutes] does not, however, apply to a claim for punitive damages in a federal civil rights suit." *Meade ex rel. Estate v. Prison Health Servs.*, 1995 U.S. Dist. LEXIS 8065, *5 (M.D. Fla. June 8, 1995) (internal citation and quotations omitted).

[8]Defendants do not challenge the qualifications of Dr. Godenson to testify as an expert against them, and therefore the Court will presume he is qualified.

Godenson also criticizes Norgell for failing to do a complete examination or take a complete history. (Godenson may Depo. at 72, 77-78). Specifically, Godenson states that during her first encounter with Kimbrough, Norgell should have "palpated his ribs and chest," "examined his leg," and sent him to the hospital for further evaluation. (Godenson May Depo. at 81-84). Godenson also testified that, during her second encounter with Kimbrough, Norgell's ordering x-rays to be taken within no specific time frame was "meaningless" and indicated that she should have arranged for an urgent x-ray. (Godenson May Depo. at 86, 89, 91-93). Finally, regarding Wood, Godenson had several specific criticism as well. First, he indicated that Wood did not obtain a complete history either. (Godenson May Depo. at 105). Godenson testified that, based on Kimbrough's complaints at the time, Wood should have "palpated his ribs" and checked for tenderness in his flank. (Godenson May Depo. at 105-6). Godenson also indicates that Wood should have examined his leg, at least once she saw blood in his urine, and that she should have sent him to the hospital or called Dr. Norgell once she observed the red color of Kimbrough's urine. (Godenson May Depo. at 109, 113).

      This list of criticisms, while not exhaustive, offers more than enough specifics to support Plaintiffs' claims of negligence against these three Defendants. As discussed above, Plaintiffs have presented enough evidence to support a claim of deliberate indifference by these three PHS employees, which by definition means that they have shown evidence of more than mere negligence.

**IV. Conclusion**

For the reasons stated above, summary judgment is inappropriate in this case. Accordingly, it is

**ORDERED** Defendants' Motions for Summary Judgment (Doc. 349, 351, 352 and 353) are **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 4, 2006.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party