**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JOANNE KIMBROUGH and WILLIE J. KIMBROUGH, SR. et al.,**

       **Plaintiff,**

-vs-                                                            **Case No. 6:05-cv-471-Orl-31KRS**

**CITY OF COCOA et al.,**

       **Defendants.**

## ORDER

This case arises out of the events surrounding the death of Willie J. Kimbrough, Jr. ("Kimbrough"). Plaintiffs have filed claims under 42 U.S.C. 1983 ("§ 1983") as well as Fla. Stat. § 768.16, *et seq.* ("Wrongful Death Act"). This matter comes before the Court on a Motion for Summary Judgment (Doc. 360) filed by the City of Cocoa (the "City"), and the Plaintiffs' Response thereto (Doc. 427).

**I. Background**

    *A) The Parties and Relevant Entities*

The Plaintiffs, Joanne Kimbrough and Willie J. Kimbrough, Sr., are Kimbrough's parents, and are co-personal representatives of the estate of Kimbrough ("the Estate"). They bring this action on behalf of the survivors of the Estate, including Ashanti Kimbrough, Victoria Fisher Kimbrough, and Di'Andre Michael O'Shone White (the minor surviving children of Kimbrough). The Plaintiffs were residents of Brevard County, Florida.

Officer Terrance Glover ("Glover"), Lt. William Gregory ("Gregory"), Corporal Walter Baker ("Baker"), Officer Michael J. Badarack ("Badarack"), Officer Richard Gregg, II ("Gregg"), and Lt. Anna Cox ("Cox") (collectively "the Officers")[1] were police officers, at all times relevant to this action, employed by the Cocoa Police Department ("CPD").  Donald Dobson ("Dobson") was the booking officer at CPD on the evening of November 30, 2002, and early morning of December 1, 2002. Chief Crawford ("Crawford") was the Chief of Police of CPD on November 30 and December 1, 2002.

*B) Facts*

Late in the evening of November 30, 2002, Kimbrough went to the Shadozz Lounge ("Shadozz") in Cocoa, FL with his cousin, Alivin Adderly ("Adderly").  Kimbrough and Adderly were in the parking lot of Shadozz when Kimbrough left Adderly to walk across the street and talk to a woman. (Adderly Depo. at 65-67).  Less than five minutes passed before Adderly heard sirens and turned around to see Glover and Cox approaching Kimbrough from behind.[2] (Adderly Depo. at 71-72).  Glover yelled "Turn around!" and Kimbrough turned around and gestured with both hands up in the air, as if to indicate "What?". (Adderly Depo. at 65).  Badarack, then came up from

---

[1] Glover, Badarack and Cox are collectively referred to, where appropriate, as the "Arresting Officers."

[2] Glover alleges that he discovered Kimbrough attempting to break into a car in a nearby trailer park, that he chased Kimbrough and that Kimbrough threw a brick or rock at him. (Doc. 328 at 2-4). However, on a Motion for Summary Judgment, the Court must resolve all factual disputes in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Therefore, the Court will assume that Adderly's testimony is true, which makes it unlikely that Kimbrough had time to be in the trailer park at all.

the side and tackled Kimbrough to the ground, jumped on his back, and then picked him up and threw him on the ground. (Adderly Depo. at 77; Waters Depo at 59).

Glover then came over and began to kick Kimbrough and knee spiked him while he was on the ground. (Waters Depo. at 64-67; Doc. 414-8 at 1). By this time, six to ten patrol cars had descended upon the scene and were parked in a circle around Kimbrough and the Arresting Officers, blocking the view of most bystanders.[3] (Adderly Depo. at 75; Waters Depo at 71-72, 81, Gregory Depo. at 13-14). Witnesses heard Kimbrough screaming that he was in pain and begging the Officers to stop beating him. (Waters Depo. at 73, 82; Doc. 414-9 at 6-7). The Officers continued to beat Kimbrough for approximately six minutes, even though he was handcuffed on the ground and not resisting. (Doc. 410 Ex. B; Doc. 414-9 at 4-5). Three officers were seen beating Kimbrough with night sticks and dragging him along the ground. (Doc. 414-11 at 1).[4] At least four officers were on top of Kimbrough when Gregory arrived on the scene, and Kimbrough was saying that he could not breathe. (Gregory Depo. at 13-14, 20). Badarack admits to using two knee spikes on Kimbrough. (Badarack Depo. at 59). One witness stated that Kimbrough appeared too weak to comply with the Officers' demands to get up and when he was placed in the patrol car, he fell out, looking limp as if he was dead. (Doc. 414-11). Even after Kimbrough had been pulled up to a standing position, one of the Officers performed another knee spike on him. (Doc. 414-18 at 11-

---

[3] It is unclear at which point each Officer arrived on the scene, however, the evidence clearly establishes that all the Officers were on the scene to observe the Arresting Officers holding Kimbrough on the ground and therefore would have been present for at least the second take down, discussed *infra*.

[4] Badarack admits using two knee spikes on Kimbrough and Baker admits spraying him in the face with a chemical agent - all while he was on the ground. (Badarack Depo. at 59; Doc. 414-19 at 10).

12). As Kimbrough was being put in the patrol car, Gregory recalls Badarack almost running him over to get to where Kimbrough was, and Badarack admits that Kimbrough was taken to the ground a second time. (Gregory Depo. at 17; Badarack Depo. at 66).  Officer Christopher Bradshaw ("Bradshaw"), while putting Kimbrough into a patrol car, noticed that his legs were in shackles and heard Kimbrough say that he needed to catch his breath. (Doc. 414-18 at 14-15). Kimbrough told Bradshaw that he needed help getting his feet into the patrol car. (Doc. 414-18 at 14-15).  Bradshaw noticed that Kimbrough had a severely swollen black eye. (Doc. 414-18 at 17).

After the arrest and beating, Kimbrough was brought to CPD for booking. Dobson observed Kimbrough being brought in and placed in a cell, but did not book him. Emergency Medical Technicians ("EMTs") arrived at the station at 23:50 to examine Officer Glover, who was not yet there.  EMT Phil Butler ("Butler") looked into Kimbrough's cell and saw him laying on the floor of his cell with his pants around his ankles, calling out for an officer to help him. (Doc. 414-14 at 19-20; Doc. 414-15 at 1, 5-6). Butler smelled an odor of feces coming from Kimbrough's cell. (Doc. 415-15 at 1).  Even though EMTs were at the station for over 15 minutes waiting to examine Glover, they were never asked to examine Kimbrough. (Doc. 414-14 at 5, 12, 26)  No help was given, even though Kimbrough had a severely swollen black eye, had defecated on himself, had been sprayed in the face with a chemical agent and had mentioned he had asthma. (Doc. 414-18 at 11-12; Doc. 414-18 at 17). Within a few hours of his arrest, Kimbrough was transported to the Brevard County Detention Center ("BCDC") without ever being seen by a medical professional.

On December 4, 2002, Kimbrough bonded out of BCDC, and family members brought him to Cape Canaveral Hospital.  He was diagnosed with acute renal failure secondary to

rhabdomyolysis,[5] and a history of hepatitis and electrolyte abnormalities secondary to rhabdomyolysis. Kimbrough was placed on dialysis but, unfortunately, was pronounced dead at 5:07 p.m. on December 4, 2002.

**II. Standard of Review**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who

---

[5]Rhabdomyolysis is the destruction or degeneration of skeletal muscle tissue (as from traumatic injury, excessive exertion, or stroke) that is accompanied by the release of muscle cell contents (as myoglobin and potassium) into the bloodstream resulting in hypovolemia (a decrease in the volume of the circulating blood), hyperkalemia (the presence of an abnormally high concentration of potassium in the blood), and sometimes acute renal failure. Medline Plus, U.S. National Library of Medicine, available at http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last modified February 4, 2003).

fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

"Courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party . . . [e]ven though the facts accepted at the summary judgment stage of the proceedings may not be the actual facts of the case." *Davis v. Williams,* 451 F.3d 759, 763 (11th Cir. 2006) (internal citations and quotations omitted). The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir. 1999).

**III. Legal Analysis**[6]

*A) § 1983 Claims*

The Plaintiffs allege that the City is liable under § 1983 for violations of Kimbrough's Fourth and Fourteenth Amendment rights. In order to establish municipal liability under § 1983, Plaintiffs must first establish that one or more of Kimbrough's constitutional rights were violated. *McDonnell v. Brown,* 392 F.3d 1283, 1289 (11th Cir. 1987).

---

[6]The following Legal Analysis assumes that the evidence is accepted in the light most favorable to the Plaintiffs, as it must be at the Summary Judgment stage. At trial, the jury will be free to view the evidence in a different light, and come to its own conclusions.

This Court has already ruled that Plaintiffs have offered sufficient evidence to support a violation of Kimbrough's constitutional rights through the use of excessive force and failure to provide medical care by the Officers. (See this Court's Order, issued October 19, 2006, at Doc. 445) Therefore, the Court incorporates by reference its previous discussion of those issues, and moves on.

The City correctly asserts that the doctrine of *respondeat superior* does not apply to claims arising under § 1983. *Engelleiter v. Brevard County Sheriff's Dept.,* 290 F. Supp. 2d 1300, 1308 (M.D. Fla.). Instead, municipal liability under § 1983 may be established by evidence that:

> (1) the constitutional deprivation was caused by a policy or custom of the local governmental entity, *or* (2), the final policymakers of the local governmental entity acted with deliberate indifference to a constitutional deprivation, *or* (3) the final policymakers of the local governmental entity delegated their authority to a subordinate who, in turn, caused a constitutional deprivation, *or* (4) the final policymakers of the local governmental entity ratified a constitutionally impermissible decision or recommendation of a subordinate employee.

*Sherrod v. Palm Beach County School District,* 424 F. Supp. 2d 1341, 1344 (S.D.Fla. 2006) (emphasis added).

The City argues that Plaintiffs have failed to produce sufficient evidence of any policy or custom that caused, or was the moving force behind, the violations of Kimbrough's constitutional rights. Plaintiffs allege that the City had several policies or customs that led to the violation of Kimbrough's rights, and the Court will address each one individually.

A municipal policy or custom is "a persistent and wide-spread practice." *Church v. City of Huntsville,* 30 F.3d 1332, 1345 (11th Cir. 1994). Plaintiffs must establish, not only that the policy or custom existed but also that "actual or constructive knowledge of such custom" is attributable to

city officials. *Id.* Therefore, "random acts or isolated incidents" are generally not enough to establish municipal liability. *Id.* However, in *Depew v. City of St. Marys*, 787 F.2d 1496 (11th Cir. 1986), municipal liability was established on the basis of five prior incidents of excessive force because the city had knowledge of these incidents and failed to take remedial action. *See Church,* 30 F.3d at 1345.

### 1. Excessive Force

First, Plaintiffs allege that the City had a policy or practice of using excessive force. The City has a written policy regarding the use of force that requires reporting the use of force to supervisors either in writing or verbally, and provides for review. (Doc. 425-37). Therefore, Plaintiff must show that the City has a custom of allowing the use of excessive force by its officers, and ignoring its own written policies. To meet this burden, Plaintiffs point to 17 incidents involving CPD officers (primarily Badarack) acting improperly, however only 10 of these incidents involve the use of excessive force. (Doc. 427 at 13-14). In the majority of these ten incidents, Plaintiffs admit that some form of official action was taken, whether it be an investigation or a disciplinary action against the officers involved. In fact, in one instance where a suspect was injured from the use of a taser by Badarack, the City responded by suspending the use of tasers by all CPD officers until more training had been provided. Therefore, it seems that there are only four incidents that Plaintiffs can point to where no action was taken, and with regard to at least two of those incidents, there is no evidence that the City was even aware that they occurred. It is true that the City was aware of the Kimbrough incident and that its response can be considered inadequate because it failed to conduct an internal affairs investigation or to discipline any of the officers involved. However, this one incident is not enough to create municipal liability. Even

viewing the evidence in the light most favorable to the Plaintiff, there is simply no support for the argument that the City was aware of, and deliberately indifferent to, a custom of using excessive force. It appears that practically every time an accusation of excessive force arose, the City reacted to it.

### 2. Failure to Provide Medical Care

Next, the Plaintiffs allege that the City is liable under § 1983 because it does not have a "clear" written policy regarding when suspects should be provided with medical care. Plaintiffs note that the City's own expert, Michael Cosgrove ("Cosgrove"), testified that CPD should have a written policy on the provision of medical care to suspects, but that he was not aware of any. (Doc. 414-54 at 151-52). Plaintiffs' expert, Lou Reiter ("Reiter"), states in his report that the generally accepted practice in law enforcement is to irrigate the eyes of a suspect who has been sprayed with a chemical agent, and that "any professional law enforcement agency would have required Mr. Kimbrough to be examined by medically trained personnel." (Doc. 425-12 at 22).

The City states that it does have a policy regarding provision of medical care to individuals in custody. This policy simply states that

> [t]he on-duty supervisor is to obtain or insure proper medical treatment if required. All obvious and alleged injuries are to be photographed and photos submitted with "Use of Force Form."

(Crawford Affidavit, Ex. E). It is clear that this policy was ignored on the night of Kimbrough's arrest because he did not receive any medical attention at CPD and photos were not taken of his injuries. However, the Plaintiffs fail on this theory because there is no evidence of past failure to provide medical care that would put the City on notice as to a problem with its policy.

The City also had a policy regarding the use of chemical agents, instructing officers to assist suspects in decontamination as soon as possible. Plaintiffs argue that this policy was routinely ignored because Butler testified that on several occasions he arrived at CPD to find that suspects had not been decontaminated even though they exhibited obvious signs of suffering from the effects of a chemical agent. (Doc. 415-15 at 14-16). However, the very fact that Butler, an EMT, saw these suspects means that they were provided medical care. Again, there is no evidence that the City had notice that suspects were being denied medical care after being sprayed with a chemical agent - in fact the evidence suggests the opposite.

### 3. Failure to Properly Train

It is well established that inadequate training can, in limited circumstances, provide the basis for municipal liability under § 1983. *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 407 (1997) (hereinafter "*Bryan County*"). However, Plaintiffs must show that the municipality acted with deliberate indifference to the known or obvious consequence of its actions. *Id*.

> [A municipality's] continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the deliberate indifference – necessary to trigger municipal liability.

*Id.* Plaintiffs attempting to establish liability for failure to train, must show that the training program was inadequate, and not simply that it was administered poorly on one occasion. *See id.*

> [T]he existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the "moving force" behind the plaintiff's injury.

*Id.* at 407-08.

Municipalities may also be held liable for a failure to train if the need for training is obvious and the lack thereof is likely to result in violations of constitutional rights. *City of Canton v. Harris,* 489 U.S. 378, 390 (1989). "[T]he need to train officers in the constitutional limitations on the use of deadly force can be said to be so obvious that failure to do so could properly be characterized as deliberate indifference." *Id.*

Viewing the evidence in the light most favorable to the Plaintiffs, a jury could find that the previously referenced eight incidents of excessive force (excluding the two which the City does not appear to be aware of) put the City on notice that its efforts to train its officers in the use of force were unsuccessful. There is also evidence that some officers, including Cox, were not trained in defensive tactics at all. (Doc. 427 at 4).

Plaintiff also criticizes the City for failing to have a policy on training its officers in the use of knee spikes. (See Doc. 425-12 at 14). Plaintiffs' expert, Lou Reiter ("Reiter"), opines that the failure to provide such a policy "constituted a failure by the final policy makers of the agency." (Doc. 425-12 at 14). In his opinion, the fact that knee spikes are taught at the police academy put the City on notice that they would be used, and the City had a responsibility to institute a policy and provide training on when and how knee spikes should be used. (Doc. 425-12 at 14). Reiter also concludes that Badarack's use of a knee spike in this situation was inappropriate, especially because Kimbrough was on the ground and there was "no opportunity for any recoil from the delivered blow." (Doc. 425-12 at 15).

Overall, the evidence presented by Plaintiffs is sufficient to create a question of material fact as to whether the City's deliberate indifference led to improper training in the use of force which ultimately was the moving force behind the violation of Kimbrough's constitutional rights.

### 4. Improper Hiring Procedures

Plaintiffs allege that the City should not have hired Glover because he was fired from another Police Department, which had deemed him "untrainable" in defensive tactics. (Doc. 425-2, 425-3, and 425-4). CPD's Chief of Police was aware that Glover had been fired from his previous position at the time the hiring decision was made, however, no inquiry was made as to why Glover was deemed untrainable or which areas he had problems with. Still, one bad hiring decision does not necessarily create municipal liability.

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute deliberate indifference.

*Bryan County,* 520 U.S. at 412.

In this case, there is no evidence that further investigation into Glover's background would have revealed that the obvious consequence of hiring him would be the violation of the constitutional rights of suspects. Even if Crawford had read all of the documents pertaining to Glover's termination, there is no indication that those documents would have revealed a propensity to use excessive force. (Reiter Depo. at 68; Doc. 414-54 at 189-90). Glover went on to pass the City's training program with no apparent problems regarding the use of force. Therefore, the argument that the decision to hire him is the result of deliberate indifference to constitutional rights on the part of the City is not supported by the evidence.

### 5. Supervision and Discipline

The Plaintiffs allege that the City failed to supervise and discipline its officers. First, Plaintiffs point to the fact that none of the Officers were disciplined as a result of the Kimbrough incident, however this can hardly be said to have caused Plaintiffs' injuries, because it occurred after the fact. The rest of Plaintiffs evidence concerns instances of misconduct primarily by Badarack that were not properly dealt with. However, the failure to discipline a single officer cannot alone demonstrate a policy or custom of failing to supervise and/or discipline its officers. As discussed above, it appears that almost every suggestion of excessive force was met with some kind of official action.

### 6. Code of Silence[7]

Reiter's expert report states that the Officers are "engaged in a concept known as the 'Code of Silence' and that this is a systemic problem within the agency." (Doc. 425-12 at 15). However, Plaintiffs present no evidence that the City or any of its final policymakers were aware of, let alone deliberately indifferent to, this code of silence. Nor is there any evidence from which a jury could conclude that the code of silence was a moving force behind the violation of Kimbrough's rights.

---

[7]The City argues that Plaintiff's claims of Code of Silence, Failure to Investigate, Failure to Maintain Video Equipment and Ratification must be dismissed because they were not plead in the Third Amended Complaint. In support of its argument, the City cites *Stovall v. Allums,* 2005 WL 2002069 (M.D. Ala. Aug 16, 2005). However, *Stovall* dismissed Plaintiff's claim on the ground that his Complaint did not allege *any* unconstitutional custom or policy on the part of the City. *Id*. at *7 n. 35. There is no reason why the Plaintiffs cannot support claims of municipal liability with evidence of policies and customs found through the discovery process. It would be ludicrous to require a Plaintiff to anticipate all of a municipality's policies and customs prior to discovery, and to plead them with specificity from the outset.

Therefore, Plaintiffs have failed to show enough evidence to sustain a claim under § 1983 on the code of silence theory.

### 7. Failure to Investigate

It is undisputed that there was no internal investigation conducted at CPD with regard to the death of Kimbrough. Furthermore, both Reiter and Crawford testified that an internal investigation should have been conducted, in addition to the investigation by the Florida Department of Law Enforcement ("FDLE"). (See Doc. 425-12 at 18; Doc. 425-56 at 2). However, there is no evidence presented to show that the City failed to conduct internal investigations in the past, such that this could be considered a custom or policy. Even assuming that the failure of the Chief of Police to conduct an internal investigation constitutes a deliberately indifferent act by a final policy maker, it could not have been the cause of Kimbrough's injuries. Therefore, this theory fails as well.

### 8. Failure to Maintain Video Equipment

Despite the fact that the booking areas and cells at CPD are monitored by video cameras, no tapes were available from the night of Kimbrough's arrest, apparently because CPD employees forgot to load tapes into the machines. (Doc. 414-54 at 96). Additionally, even though some of the patrol cars on the scene of Kimbrough's arrest had cameras in them, those tapes were also unavailable because the cameras were not working. (Doc. 414-54 at 97). However, there is again no evidence that the City had notice of these problems, was deliberately indifferent in failing to maintain its video equipment on a regular basis, or that such failure was a moving force behind the violation of Kimbrough's rights. Therefore, this theory fails as well.

### 9. Ratification

Finally, Plaintiff argues that the City should be held libel on a theory of ratification because the City failed to order an internal investigation into the allegations regarding Kimbrough..

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*St. Louis v. Praprotnik*, 485 U.S. 112, 127 (U.S. 1988).

Plaintiffs note that the City failed to investigate the arrest and alleged beating of Kimbrough, the failure to provide him medical care, the failure of the police department to properly maintain the video equipment, and the failure of Cox to take pictures of Kimbrough's injuries as required by written policy.  An investigation was conducted by the FDLE, at the request of Crawford. (See Doc. 425-54 at 17).  Plaintiff's point to a case from the Sixth Circuit that held that the failure to conduct any serious investigation into allegations of excessive force was sufficient to support a charge of ratification. *See Marchese v. Lucas,* 758 F.2d 181, 187-88 (1985).

The evidence in this case indicates that the City should have conducted an internal investigation after the FDLE investigation was over. (See Doc. 425-56 at 2).  An internal investigation would have focused on whether the Officers followed CPD policy, rather than whether there was enough evidence to support criminal charges. (See Doc. 425-54 at 17, 19).  In this case, the fact that the City failed to conduct further investigations or discipline any of its officers after the FDLE investigation was concluded, can support a claim of ratification.  A jury could find that the City was aware of the actions taken by its officers and their justifications, and

that its failure to inquire any further or reprimand any of the Officers, shows that the City sanctioned not only their actions, but also the reasons behind those actions.

*B) Claims under the Wrongful Death Act*

First, the City argues that there can be no claim under the Wrongful Death Act for the use of excessive force because there is no such thing as the negligent use of excessive force. *See City of Miami v. Sanders,* 672 So. 2d 46, 47-48 (Fla. 2nd DCA 1996).  However, Florida's Wrongful Death Act is not limited to instances of negligence.  The language of the statute allows for recovery "[w]hen the death of a person is caused by the *wrongful act*, negligence, default, or breach of contract or warranty of any person . . ." Fla. Stat. § 768.19 (2002) (emphasis added). The use of excessive force is surely enough to show a "wrongful act."  Therefore, it is possible for the Plaintiffs to maintain a cause of action in the alternative under the Wrongful Death Act for excessive force.

Second, the City argues that there was no failure to provide medical care because none of its officers knew Kimbrough needed any medical attention.  This is plainly contradicted by the record.  All of the Officers were at the scene of the beating, and therefore they all knew Kimbrough needed medical attention.  At least Cox and Baker knew Kimbrough had been sprayed with a chemical agent.  Officer Bradshaw testified that Kimbrough had a badly swollen black eye before he was even put in a patrol car.  And Dobson knew that Kimbrough was lying on the floor of his cell, saying that he was sick.  Therefore, there is sufficient evidence that the Officers were aware that Kimbrough needed medical attention to sustain a cause of action under the Wrongful Death Act.

### IV. Conclusion

Plaintiffs have supplied sufficient evidence at this stage to maintain claims under the Wrongful Death Act, as well as § 1983 claims against the City for failure to train and ratification. Accordingly, it is

**ORDERED** that the Motion for Summary Judgment filed by the City of Cocoa (Doc. 360) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on November 16, 2006.

Copies furnished to:

Counsel of Record
Unrepresented Party

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE